TONY GULLO MOTORS I, L.P. and
Brien Garcia, Petitioners,

v.

Nury CHAPA, Respondent.

No. 04–0961.

Supreme Court of Texas.

Argued Oct. 19, 2005.

Decided Dec. 22, 2006.

Rehearing Denied Feb. 23, 2007.

Craig T. Enoch, Melissa Anne Prentice, Alejandro Sin Valdes, Joe Michels Jr., Roxanne T.L. Wilson, Winstead Sechrest & Minick, P.C., Austin, and William T. Green III, Houston, for Petitioner.

Kristin Bays, J. Randal Bays, Bays and Bays, Conroe, for Respondent.

Justice BRISTER delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice GREEN, and Justice WILLETT joined.

Nury Chapa bought a Toyota Highlander from Tony Gullo Motors for $30,207.38; they disagree what model of the car was involved. After a two-day trial, the six jurors answered 15 questions concerning breach of contract, fraud, and

the DTPA[1] in Chapa's favor. They also found a difference in value of the two models of $7,213, mental anguish damages of $21,639, exemplary damages of $250,000, and attorney's fees of $20,000.

The trial court disregarded the mental anguish and exemplary awards on the ground that Chapa's only claim was for breach of contract, and the fee award because Chapa had not segregated fees attributable to that claim alone. In a *per curiam* memorandum opinion, the Ninth Court of Appeals disagreed with both conclusions, reinstating all the awards but reducing exemplary damages to $125,000.

We agree that Chapa could assert her claim in several forms, but disagree that she could recover in all of them. Further, the court of appeals' judgment included exemplary damages exceeding the bounds of constitutional law and attorney's fees exceeding the bounds of Texas law. Accordingly, we reverse and remand for further proceedings.

## I. Election of Remedies

In entering judgment for Chapa on all her contract, fraud, and DTPA claims, the court of appeals violated the one-satisfaction rule. "There can be but one recovery for one injury, and the fact that ... there may be more than one theory of liability[ ] does not modify this rule."[2]

Chapa alleged only one injury—delivery of a base-model Highlander rather than a Highlander Limited. While she could certainly plead more than one theory of liability, she could not recover on more than one.[3]

---

1. *See* Texas Deceptive Trade Practices–Consumer Protection Act, TEX. BUS. & COM. CODE §§ 17.41–.63 ("DTPA").

2. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex.1991).

3. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex.1988) ("When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief."); *see also* TEX. BUS. & COM. CODE § 17.43 (providing that "no recovery shall be permitted under both this subchapter and another law

■ For breach of contract, Chapa could recover economic damages and attorney's fees, but not mental anguish or exemplary damages.[4] For fraud, she could recover economic damages, mental anguish, and exemplary damages, but not attorney's fees.[5] For a DTPA violation, she could recover economic damages, mental anguish, and attorney's fees, but not additional damages beyond $21,639 (three times her economic damages).[6] The court of appeals erred by simply awarding them all.

■ But as Chapa was the prevailing party, she is still entitled to judgment on the most favorable theory supported by the pleadings, evidence, and verdict.[7] Gullo Motors does not challenge the jury's breach of contract or economic damages findings in this Court. Accordingly, the only question before us is whether Chapa is entitled to anything more.

## II. Mere Breach of Contract

■ Gullo Motors argues that Chapa's only claim is in contract, as the parties' only dispute is whether she contracted

for a base-model Highlander or Highlander Limited. "An allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA."[8] Similarly, "the usual view is that mere breach of contract is not fraud and that it may not be evidence of fraud."[9]

■ But Chapa alleged more than a mere breach of contract; her complaint was not just that Gullo Motors failed to deliver a Highlander Limited, but that it never intended to do so. A contractual promise made with no intention of performing may give rise to an action for fraudulent inducement.[10] The duty not to fraudulently procure a contract arises from the general obligations of law rather than the contract itself, and may be asserted in tort even if the only damages are economic.[11]

■ Gullo Motors argues that Chapa cannot bring a fraudulent inducement claim because she was not promised a car she did not want, but one that she did. But a party may bring a fraudulent in-

---

of both damages and penalties for the same act or practice"); *Gunn Infiniti, Inc. v. O'Byrne,* 996 S.W.2d 854, 862 (Tex.1999) (holding plaintiff must elect recovery under either DTPA or fraud after remand).

**4.** *See Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 72 (Tex.1997) (holding mental anguish and exemplary damages unavailable for breach of contract).

**5.** *See New Amsterdam Cas. Co. v. Texas Indus.,* 414 S.W.2d 914, 915 (Tex.1967) (stating that "attorney's fees are not recoverable either in an action in tort or a suit upon a contract unless provided by statute or by contract between the parties"); *see also Neeley v. Bankers Trust Co. of Texas,* 757 F.2d 621, 633 (5th Cir.1985).

**6.** *See* TEX. BUS. & COM. CODE § 17.50(b)(1). For acts committed intentionally, a consumer may recover additional damages up to three times the amount of economic and mental anguish damages combined, *see*

*id.;* with regard to the DTPA, Chapa only requested and obtained a jury finding that Gullo Motor's violations were committed knowingly.

**7.** *See Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 566 (Tex.2002); *Boyce Iron Works,* 747 S.W.2d at 787 (Tex.1988).

**8.** *Ashford Dev., Inc. v. USLife Real Estate Serv. Corp.,* 661 S.W.2d 933, 935 (Tex.1983) (citations omitted).

**9.** *Thigpen v. Locke,* 363 S.W.2d 247, 252 (Tex. 1962).

**10.** *See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.,* 960 S.W.2d 41, 46 (Tex.1998) (quoting *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 597 (Tex.1992)).

**11.** *See id.* at 46–47.

ducement claim even if the terms of the promise are later subsumed into a contract.[12] In all such cases, the liability of the defendant on the contract does not absolve it from liability in tort damages too.[13]

■ Similarly, while the failure to deliver a Highlander Limited would not alone violate the DTPA,[14] Chapa's claim was that Gullo Motors represented she would get one model when in fact she was going to get another. While failure to comply would violate only the contract, the initial misrepresentation violates the DTPA.[15]

■ Of course, Chapa was required not just to plead but to prove her claims. Proving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof.[16] Breach alone is no evidence that breach

was intended when the contract was originally made.[17] Similarly, denying that an alleged promise was ever made is not legally sufficient evidence of fraudulent inducement.[18] Usually, successful claims of fraudulent inducement have involved confessions by the defendant or its agents of the requisite intent.[19]

■ But while breach alone is no evidence of fraudulent intent, breach combined with "slight circumstantial evidence" of fraud is enough to support a verdict for fraudulent inducement.[20] We believe Chapa met that standard here.

■ At trial, Chapa testified that she signed a contract listing a Highlander Limited, but that Gullo Motors personnel "snatched" the contract from her after she signed it, and must have destroyed it later. She also testified that the signatures on at least four documents were forged, and that

12. *See id.* at 47 (citing *Graham v. Roder,* 5 Tex. 141, 149 (1849)).

13. *See id.; Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 436 (Tex.1986).

14. *See Crawford v. Ace Sign, Inc.,* 917 S.W.2d 12, 14 (Tex.1996).

15. *See* TEX. BUS. & COM. CODE §§ 17.46(b)(7) (defining deceptive acts to include "representing that ... goods are of a particular style or model, if they are of another"), 17.46(b)(24) (defining deceptive acts to include "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed").

16. *See Spoljaric,* 708 S.W.2d at 435.

17. *See id.* ("Failure to perform, standing alone, is no evidence of the promisor's intent not to perform when the promise was made."); *Formosa Plastics,* 960 S.W.2d at 48; *Schindler v. Austwell Farmers Co-op.,* 841 S.W.2d 853, 854 (Tex.1992) (per curiam)

(finding failure to pay amount due was not fraud); *Crim Truck,* 823 S.W.2d at 597.

18. *See Miga v. Jensen,* 96 S.W.3d 207, 210–11 (Tex.2002); *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 222 (Tex. 1992) (stating that denial of making promise was "a factor" but "does not constitute evidence that the Bank never intended to perform its promise"); *Spoljaric,* 708 S.W.2d at 435 ("Failure to perform ... is a circumstance to be considered with other facts to establish intent."). *But see Thigpen v. Locke,* 363 S.W.2d 247, 252 (Tex.1962) ("[S]ubsequent breach is not evidence that may be considered in determining whether or not there was fraud in the original transaction.").

19. *See, e.g., Formosa Plastics,* 960 S.W.2d at 48 (noting that defendant's civil department director admitted that defendant had acted deceptively and had no intention of performing a key contractual promise at the time it was made); *Spoljaric,* 708 S.W.2d at 434–35 (noting that defendant denied he ever approved a bonus contract, but corporate secretary testified that he did).

20. *Spoljaric,* 708 S.W.2d at 435.

some were forgeries of her deceased husband's signature rather than her own. In light of the favorable verdict, we must assume the jury credited this testimony.[21]

■ Spoliation of evidence normally supports an inference only that the evidence was unfavorable,[22] not that it was created *ab initio* with fraudulent intent. But as the evidence here was part of the original contracting process, it provides some circumstantial evidence of fraud in that process.

■ Further, the only contract introduced at trial listed the car sold as a "2002 Toyota"; although Gullo Motors prepared the contract, it offered no explanation why the box for indicating the model was left blank. Although the contract listed a vehicle identification number that matched the base-model Chapa ultimately received, there was evidence that Gullo Motors did not contract for that car until several days after Chapa signed the contract, and thus must have added it later.[23] And when Chapa's first attorney offered to return the car for a refund, Gullo Motors refused on the ground that it had already been titled, although evidence at trial suggested that did not occur until several days later.

■ We recognize the need to keep tort law from overwhelming contract law, so that private agreements are not subject to readjustment by judges and juries.[24] But we long ago abandoned the position that procuring a contract by fraud was simply another contract dispute.[25] Because Chapa proved more than mere breach of contract here, we hold she was entitled to assert fraud and DTPA claims as well.

## III. Exemplary Damages

The jury found Gullo Motors had committed deceptive acts knowingly and found clear and convincing evidence that it had committed fraud. Beyond arguing that Chapa can only sue in contract, Gullo Motors does not challenge either finding. As we have rejected that argument, Chapa is entitled under the verdict to exemplary damages for either fraud or violation of the DTPA.[26]

But both parties challenge the court of appeals' judgment reinstating exemplary damages but reducing them to $125,000— Gullo Motors because the reinstatement went too far, and Chapa because it did not go far enough. Although the jury assessed exemplary damages for both fraud

---

**21.** *See City of Keller v. Wilson,* 168 S.W.3d 802, 819–20 (Tex.2005).

**22.** *See Trevino v. Ortega,* 969 S.W.2d 950, 953 (Tex.1998) (holding spoliation best addressed not by independent cause of action but by inference that evidence was unfavorable).

**23.** Chapa also argues that Gullo Motors' agreement after the dispute arose to install certain features of a Highlander Limited in her base-model is some evidence of its earlier fraudulent intent. We disagree; if efforts to satisfy a consumer after a dispute arises are some evidence of fraud, sellers will be loathe to make any. *Cf. PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship,* 146 S.W.3d 79, 95 (Tex.2004) ("We should encourage sellers to attempt repairs; tolling

limitations every time they do might discourage them from doing so at all.").

**24.** *See, e.g.,* William Powers, Jr., *The Availability of Tort Remedies for Breach of Contract: Border Wars,* 72 TEX. L. REV. 1209 (1994).

**25.** *See Formosa Plastics,* 960 S.W.2d at 46–47.

**26.** *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a) (providing for recovery of exemplary damages if claimant proves by clear and convincing evidence that harm resulted from fraud); TEX. BUS. & COM. CODE § 17.50(b)(1) (providing for recovery of up to three times economic damages if conduct violating DTPA was committed knowingly).

and deceptive acts at $250,000, the DTPA caps those damages at $21,639 (three times Chapa's economic loss of $7,213),[27] while the fraud award is capped at $200,000.[28] Accordingly, the court of appeals' opinion and the parties' briefs address only whether the exemplary damages were properly awarded based on fraud.

## A

■ As an initial matter, Chapa asserts that three grounds preclude our constitutional review of the exemplary damages award. First, she argues this Court lacks jurisdiction to consider whether exemplary damages are constitutionally excessive. While the excessiveness of damages as a factual matter is final in the Texas courts of appeals,[29] the constitutionality of exemplary damages is a legal question for the court.[30] We have conducted such analyses before.[31] Moreover, the Supreme Court of the United States has found unconstitutional a state constitutional provision limiting appellate scrutiny of exemplary damages to no-evidence review.[32] Only by adhering to our practice of reviewing exemplary damages for constitutional (rather than factual) excessiveness can we avoid a similar constitutional conflict.

■ Second, Chapa claims that by authorizing up to $200,000 in exemplary damages, the Legislature necessarily rendered that amount constitutionally permissible. But while "state law governs the amount properly awarded as punitive damages," that amount is still "subject to an ultimate federal constitutional check for exorbitancy."[33]

■ Third, Chapa argues that she is entitled to the jury's entire exemplary damage award because the trial court complied with the procedural protections required by the Due Process Clause. But the constitutional limitations on such awards are substantive as well as proce-

---

**27.** TEX. BUS. & COM. CODE § 17.50(b)(1). The same statutory provision limits additional damages to three times economic and mental anguish damages if conduct is committed *intentionally, id.,* but Chapa only requested a jury finding whether Gullo Motors' committed deceptive acts *knowingly.*

**28.** TEX. CIV. PRAC. & REM. CODE § 41.008(b) (capping exemplary damages at the greater of (1) noneconomic damages plus two times economic damages, or (2) $200,000).

**29.** *See Alamo Nat'l. Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981).

**30.** *See Owens–Corning Fiberglas Corp. v. Malone,* 972 S.W.2d 35, 43, 45 (Tex.1998); *see also Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 436–37, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (requiring de novo appellate review of exemplary damages because "the level of punitive damages is not really a 'fact' 'tried' by the jury") (citation omitted).

**31.** *See Bentley v. Bunton,* 94 S.W.3d 561, 607 (Tex.2002) (finding exemplary damages were not constitutionally excessive, but remanding for reassessment in light of reduced mental anguish award); *Malone,* 972 S.W.2d at 45–48 (finding exemplary damages were not constitutionally excessive).

**32.** *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 418, 426–27, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994) ("An amendment to the Oregon Constitution prohibits judicial review of the amount of punitive damages awarded by a jury 'unless the court can affirmatively say there is no evidence to support the verdict.' The question presented is whether that prohibition is consistent with the Due Process Clause of the Fourteenth Amendment. We hold that it is not.").

**33.** *Gasperini v. Ctr. for Humanities, Inc.,* 518 U.S. 415, 431 n. 12, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996); *Malone,* 972 S.W.2d at 45 ("[E]ven if an assessment of punitive damages is not deemed excessive under governing state law, it may violate a party's substantive due process right to protection from 'grossly excessive' punitive damages awards.").

dural.[34] Even if the procedural processes were perfect, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." [35]

## B

■ We review not whether the exemplary damage award is exorbitant (as the dissent says), but whether it is constitutional. In reviewing the amount of an exemplary damage award for constitutionality, we have been directed to consider three "guideposts": (1) the nature of the defendant's conduct, (2) the ratio between exemplary and compensatory damages, and (3) the size of civil penalties in comparable cases.[36]

■ The reprehensibility of Gullo Motors' conduct (the most important of the guideposts) [37] depends in turn on five more factors, all but one of which weigh against exemplary damages here.[38] Gullo Motors' actions did not cause physical rather than economic harm, did not threaten the health or safety of others, and did not involve repeated acts rather than an isolated incident. Chapa claims she was financially vulnerable, but the only harm she alleged (that her SUV did not have Michelin tires and lumbar-support seats) did not threaten financial ruin.[39] Only the last factor, that the conduct at issue was deceitful rather than accidental, points in Chapa's favor. The existence of a single factor "may not be sufficient to sustain a punitive damages award." [40]

■ Touching the second guidepost, the Supreme Court has declined to adopt a bright-line ratio between actual and exemplary damages, but has stated that "few awards exceeding a single-digit ratio . . . will satisfy due process." [41] Further, the Court has pointed to early statutes authorizing awards of double, treble, or quadruple damages as support for the conclusion that "four times the amount of compensatory damages might be close to the line of constitutional impropriety." [42] Here, the court of appeals' award exceeds four times Chapa's total compensatory award, and is more than 17 times her economic damages. Further, the jury's award of precisely $21,639 for mental anguish—exactly three times her economic damages of $7,213—supports the Supreme Court's observation that emotional damages themselves often include a punitive element.[43] The court of appeals' judgment

**34.** *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003); *Cooper Indus.,* 532 U.S. at 433, 121 S.Ct. 1678; *Oberg,* 512 U.S. at 420, 114 S.Ct. 2331 ("Our recent cases have recognized that the Constitution imposes a substantive limit on the size of punitive damages awards."); *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 453–54, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

**35.** *Campbell,* 538 U.S. at 417, 123 S.Ct. 1513.

**36.** *Id.* at 418, 123 S.Ct. 1513 (citing *BMW of N. Am. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

**37.** *Id.* at 419, 123 S.Ct. 1513 (quoting *Gore,* 517 U.S. at 575, 116 S.Ct. 1589).

**38.** *See id.*

**39.** *Cf. Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 24 (Tex.1994) ("[A]n insurance carrier's refusal to pay a claim cannot justify punishment unless the insurer was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim-such as death, grievous physical injury, or financial ruin.").

**40.** *Campbell,* 538 U.S. at 419, 123 S.Ct. 1513.

**41.** *Id.* at 425, 123 S.Ct. 1513; *Gore,* 517 U.S. at 581–82, 116 S.Ct. 1589.

**42.** *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513.

**43.** *See id.* at 426, 123 S.Ct. 1513; *see also* RESTATEMENT (SECOND) OF TORTS § 908, cmt. c, at 466 (1977) ("In many cases in which compensatory damages include an

at least pushes against, if not exceeds, the constitutional limits.

■ Finally, we must compare the exemplary damages awarded here to civil penalties authorized in comparable cases. The Texas Occupations Code provides for a maximum civil penalty of $ 10,000 for statutory or regulatory violations by motor vehicle dealers.[44] Similarly, the attorney general could collect not more than $20,000 as a civil penalty under the DTPA in a case like this.[45] These are precisely the kinds of penalties for comparable misconduct the Supreme Court has used—and says we must use—in our constitutional analysis.[46]

■ Chapa argues we should consider the possibility that Gullo Motors might be found criminally liable or lose its license for what happened here. But she provides no proof that such a sanction has ever been awarded in a case like this. "[T]he remote possibility of a criminal sanction

does not automatically sustain a punitive damages award."[47]

The dissent reaches a different conclusion only by changing the constitutional standards. The Supreme Court says "repeated conduct" refers to recidivism;[48] the dissent says it means reiterating a single misrepresentation to a single consumer.[49] The Supreme Court says $1,000,000 in emotional anguish does not mean there are "physical injuries";[50] the dissent says $21,000 in emotional anguish is enough to conclude otherwise.[51] The Supreme Court says multiplying damages by a factor of 4 is "close to the line of constitutional impropriety";[52] the dissent says using a factor of 4.33 is unworthy of our review.[53] The Supreme Court says we must look to the civil penalties "imposed in *comparable* cases";[54] the dissent says we should look to the general $200,000 cap applicable to *all* exemplary cases regardless of their nature.[55] The Supreme Court says exemplary damages "pose an acute danger of

---

amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both.").

44. TEX. OCC. CODE § 2301.801.

45. *See* TEX. BUS. & COM. CODE § 17.47(c).

46. *See Campbell,* 538 U.S. at 428, 123 S.Ct. 1513 (comparing award in bad-faith insurance case to civil penalty of $10,000 available under Utah law); *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 442–43, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) (comparing award in misappropriation case to civil penalty of $25,000 available under Oregon's Unlawful Trade Practices Act).

47. *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513 ("Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process...").

48. *See, e.g., BMW of N. Am. v. Gore,* 517 U.S. 559, 577, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance.").

49. *See* 212 S.W.3d at 318.

50. *Campbell,* 538 U.S. at 426, 123 S.Ct. 1513.

51. *See* 212 S.W.3d at 319.

52. *Campbell,* 538 U.S. at 425, 123 S.Ct. 1513.

53. 212 S.W.3d at 315.

54. *Gore,* 517 U.S. at 575, 116 S.Ct. 1589 (emphasis added); *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513; *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 442–43, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001).

55. *See* 212 S.W.3d at 317. The case cited by the dissent does not support its analysis. *See Gore,* 517 U.S. at 583–84, 116 S.Ct. 1589 (comparing award in fraud case to maximum civil penalty of $2,000 available under Alabama's Deceptive Trade Practices Act).

arbitrary deprivation of property";[56] the dissent perceives no danger in pushing against the constitutional limits in all fraud cases, as the only factor present here (deceitful conduct) is present in every one.

While finding the jury verdict of $250,000 constitutionally excessive, the court of appeals gave no explanation for its award of half that amount. Exemplary damages are not susceptible to precise calculation, but this is still five to ten times more than comparable civil penalties, or what Chapa could recover under the consumer-friendly DTPA.[57] Pushing exemplary damages to the absolute constitutional limit in a case like this leaves no room for greater punishment in cases involving death, grievous physical injury, financial ruin, or actions that endanger a large segment of the public.[58] On this record, Gullo Motors' conduct merited exemplary damages, but the amount assessed by the court of appeals exceeds constitutional limits.

## C

■■■ The Texas Rules of Appellate Procedure provide for remittitur orders by the courts of appeals,[59] but make no similar provision for this Court. While this Court may review the constitutionality of an exemplary damages award, the amount of a suggested remittitur is in the first instance a matter for the courts of appeals.

Thus, for example, when our constitutional review in *Bentley v. Bunton* found evidentiary support for some amount of mental anguish damages but not for the $7 million awarded, we remanded to the court of appeals to determine an appropriate remittitur.[60] When the case returned to us after remittitur but without any reassessment of exemplary damages, we returned it again to the court of appeals to conduct a constitutional analysis of those damages in the first instance.[61]

Accordingly, having found that the amount awarded by the court of appeals exceeds the constitutional limitations on exemplary damages, we remand to that court for determining a constitutionally permissible remittitur.

## IV. Attorney's Fees

The jury found a reasonable and necessary attorney's fee "in this case" was $20,000.[62] During and after trial, Gullo Motors objected that fees were not recoverable for Chapa's fraud claim, and thus had to be excluded. We agree, and thus reverse and remand the fee issue for a new trial.

■■■ For more than a century, Texas law has not allowed recovery of attorney's fees unless authorized by statute or contract.[63] This rule is so venerable and

---

56. *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 432, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).

57. *Cf. PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 89 (Tex. 2004) ("Frequently, the DTPA is pleaded not because it is the *only* remedy, but because it is the most *favorable* remedy.") (italics in original).

58. *See Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 24 (Tex.1994).

59. TEX. R. APP. P. 46.

60. 94 S.W.3d 561, 605–08 (Tex.2002).

61. *See Bunton v. Bentley*, 153 S.W.3d 50, 53–54 (Tex.2004) (per curiam).

62. The figure represented fees only through the trial level; Chapa tendered no evidence or jury question on appellate fees.

63. *See, e.g., Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 567 (Tex.2002); *Dallas Cent. Appraisal Dist. v. Seven Inv. Co.*, 835 S.W.2d 75, 77 (Tex.1992); *New Amsterdam Cas. Co. v. Texas Indus., Inc.*, 414 S.W.2d 914, 915 (Tex. 1967); *Mundy v. Knutson Constr. Co.*, 156 Tex. 211, 294 S.W.2d 371, 373 (1956).

ubiquitous in American courts it is known as "the American Rule."[64] Absent a contract or statute, trial courts do not have inherent authority to require a losing party to pay the prevailing party's fees.[65] As a result, fee claimants have always been required to segregate fees between claims for which they are recoverable and claims for which they are not.[66]

We recognized an exception to this historical practice in 1991 that has since threatened to swallow the rule. In *Stewart Title Guaranty Co. v. Sterling,* we affirmed the general rule: "the plaintiff is required to show that [attorney's] fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees."[67] But we then added:

> A recognized exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or

denial of essentially the same facts." *Flint & Assoc. v. Intercontinental Pipe & Steel, Inc.,* 739 S.W.2d 622, 624–25 (Tex.App.-Dallas 1987, writ denied). Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "interwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims. *Gill Sav. Ass'n v. Chair King, Inc.,* 783 S.W.2d 674, 680 (Tex.App.-Houston [14th Dist.] 1989), *modified,* 797 S.W.2d 31 (Tex. 1990) (remanded to the trial court for reexamination of attorney's fee award).[68]

As the only two authorities cited in this passage suggest, this exception had not been recognized by this Court before, but only by a few courts of appeals beginning about ten years earlier.[69] In fact, we did not even apply the exception in *Sterling* (as the fees there could be segregated),[70] and appear to have applied it only once since.[71]

---

**64.** *See, e.g., Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Res.,* 532 U.S. 598, 602, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) ("In the United States, parties are ordinarily required to bear their own attorney's fees-the prevailing party is not entitled to collect from the loser. Under this 'American Rule, " we follow "a general practice of not awarding fees to a prevailing party absent explicit statutory authority.") (internal citations omitted).

**65.** *Travelers Indem. Co. of Connecticut v. Mayfield,* 923 S.W.2d 590, 594 (Tex.1996).

**66.** *See Stewart Title Guar. Co. v. Aiello,* 941 S.W.2d 68, 73 (Tex.1997); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 10 (Tex.1991); *Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649, 650 (Tex.1985); *Int'l Sec. Life Ins. Co. v. Finck,* 496 S.W.2d 544, 547 (Tex. 1973).

**67.** 822 S.W.2d at 10.

**68.** *Id.* at 11–12.

**69.** *See, e.g., Village Mobile Homes, Inc. v. Porter,* 716 S.W.2d 543, 552 (Tex.App.-Austin 1986, writ ref'd n.r.e.); *de la Fuente v. Home Sav. Ass'n,* 669 S.W.2d 137, 146 (Tex.App.-Corpus Christi 1984, no writ); *First-Wichita Nat'l Bank v. Wood,* 632 S.W.2d 210, 215(Tex.App.-Fort Worth 1982, no writ); *Wilkins v. Bain,* 615 S.W.2d 314, 316 (Tex.Civ. App.-Dallas 1981, no writ).

**70.** *See Sterling,* 822 S.W.2d at 12.

**71.** *See Aiello,* 941 S.W.2d at 73. In *American Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.,* this Court held that the court of appeals erred in requiring segregation of fees between a valid contract and an invalid tortious interference claim, holding instead that both claims were valid. 798 S.W.2d 274, 280 (Tex.1990). We did not address the alternative basis for the court of appeals' ruling—that attorney's fees are not recoverable in a tort action. *See* 763 S.W.2d 809, 823 (Tex. App.-Texarkana 1988).

But the courts of appeals have been flooded with claims that recoverable and unrecoverable fees are inextricably intertwined.[72] As the exception can make all fees recoverable (even if Texas law has long said they are not), it is no surprise that more and more claimants have sought to invoke it. Moreover, as the details of an attorney's work are shrouded in the attorney-client privilege, it may be hard for anyone else to tell whether the work on several claims truly was inextricably intertwined.

The exception has also been hard to apply consistently. The courts of appeals have disagreed about what makes two claims inextricably intertwined—some focusing on the underlying facts,[73] others on the elements that must be proved,[74] and others on some combination of the two.[75] Some do not require testimony that claims are intertwined,[76] while others do.[77] When faced with fraud and breach of contract claims like those here, some have held the claims inextricably intertwined,[78] and others just the opposite.[79]

As *Sterling* suggests the need to segregate fees is a question of law,[80] the courts of appeals have generally (though not always) applied a *de novo* standard of review.[81] That standard, of course, gives no

---

**72.** A Westlaw search shows more than one hundred published and unpublished opinions addressing the *Sterling* exception since 1991. *See, e.g., Ski River Dev., Inc. v. McCalla,* 167 S.W.3d 121, 143 (Tex.App.-Waco 2005, pet. denied); *Marrs and Smith P'ship v. D.K. Boyd Oil and Gas Co.,* 2005 WL 3073794, *15 (Tex. App.-El Paso 2005, pet. denied); *Shadow Dance Ranch P'ship, Ltd. v. Weiner,* 2005 WL 3295664, *9 (Tex.App.-San Antonio 2005, no pet. h.); *Royal Maccabees Life Ins. Co. v. James,* 146 S.W.3d 340, 353 (Tex.App.-Dallas 2004, pet. denied); *Aetna Cas. & Sur. v. Wild,* 944 S.W.2d 37, 40 (Tex.App.-Amarillo 1997, writ denied); *Panizo v. Young Men's Christian Ass'n* 938 S.W.2d 163, 170 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Kenneth H. Hughes Interests, Inc. v. Westrup,* 879 S.W.2d 229, 233 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

**73.** *See, e.g., Rio Grande Valley Gas Co. v. City of Edinburg,* 59 S.W.3d 199, 224 (Tex.App.-Corpus Christi 2000) *aff'd in part, rev'd in part sub nom. Southern Union Co. v. City of Edinburg,* 129 S.W.3d 74 (Tex.2003); *Great Am. Ins. Co. v. N. Austin Mun. Util. Dist. No. 1,* 902 S.W.2d 488, 505 (Tex.App.-Austin 1993) *aff'd in part, rev'd in part,* 908 S.W.2d 415 (Tex.1995).

**74.** *See, e.g., Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture,* 50 S.W.3d 531, 550–51 (Tex.App.-El Paso 2001, no pet.); *AU Pharm., Inc. v. Boston,* 986 S.W.2d 331, 337 (Tex. App.-Texarkana 1999, no pet).

**75.** *See, e.g., Air Routing Int'l. Corp. (Canada) v. Britannia Airways, Ltd.,* 150 S.W.3d 682,

693 (Tex.App.-Houston [14th Dist.] 2004, no pet.).

**76.** *See id.*

**77.** *See Royal Maccabees,* 146 S.W.3d at 353.

**78.** *See, e.g., Nat'l Gas Clearinghouse v. Midgard Energy Co.,* 113 S.W.3d 400, 417 (Tex. App.-Amarillo 2003, pet. denied); *W. Beach Marina, Ltd. v. Erdeljac,* 94 S.W.3d 248, 268 (Tex.App.-Austin 2002, no pet.); *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.,* 3 S.W.3d 112, 131 (Tex.App.-Corpus Christi 1999, pet. denied).

**79.** *See, e.g., Young v. Neatherlin,* 102 S.W.3d 415, 421 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *Panizo v. Young Men's Christian Ass'n,* 938 S.W.2d 163, 171 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Southern Concrete Co. v. Metrotec Fin.,* 775 S.W.2d 446, 450–51 (Tex.App.-Dallas 1989, no writ).

**80.** *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) ("Following a review of the record, we conclude that the attorney's fees are capable of segregation.").

**81.** *See, e.g., Air Routing Int'l. Corp.,* 150 S.W.3d at 688; *Flagship Hotel, Ltd. v. City of Galveston,* 117 S.W.3d 552, 565 (Tex.App.-Texarkana 2003, pet. denied); *Pacesetter Pools, Inc. v. Pierce Homes, Inc.,* 86 S.W.3d 827, 833 (Tex.App.-Austin 2002, no pet.); *Aetna Cas. & Sur. v. Wild,* 944 S.W.2d 37, 41 (Tex.App.-Amarillo 1997, writ denied). *But see AU Pharm., Inc. v. Boston,* 986 S.W.2d

deference to the factual determinations of the trial judge or the jury. But the fees necessary to prove particular claims often turn on such facts—how hard something was to discover and prove, how strongly it supported particular inferences or conclusions, how much difference it might make to the verdict, and a host of other details that include judgment and credibility questions about who had to do what and what it was worth. Given all these details, it may often be impossible to state as a matter of law the extent to which certain claims can or cannot be segregated; the issue is more a mixed question of law and fact for the jury.

This case illustrates several of these difficulties. The court of appeals held that Chapa was not required to segregate fees (and thus could recover 100 percent of them) because she "was required to prove essentially the same facts in pursuing each of her three causes of action." But when Chapa's attorneys were drafting her pleadings or the jury charge relating to fraud, there is no question those fees were not recoverable. Nor does Texas law permit them to be compensated for preparing and presenting evidence regarding the defendant's net worth.

Further, the effort to recover 100 percent of their fees has required Chapa's attorneys to take a position inconsistent with her underlying claims. As noted above, Chapa has insisted (and we have agreed) that her claims were more than a mere breach of contract—they could be asserted in fraud. But when it came time to segregate fees, her attorneys testified that their work on the fraud claim could not possibly be distinguished from that on the contract and DTPA claims. Having prevailed in her argument that the claims are distinct, it is hard to see how she can also claim they are inextricably intertwined.

It is certainly true that Chapa's fraud, contract, and DTPA claims were all "dependent upon the same set of facts or circumstances," [82] but that does not mean they all required the same research, discovery, proof, or legal expertise. Nor are unrecoverable fees rendered recoverable merely because they are nominal; there is no such exception in any contract, statute, or "the American Rule." To the extent *Sterling* suggested that a common set of underlying facts necessarily made all claims arising therefrom "inseparable" and all legal fees recoverable, it went too far.

But *Sterling* was certainly correct that many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other. Many of the services involved in preparing a contract or DTPA claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable. Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearings, *voir dire* of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.

■ Accordingly, we reaffirm the rule that if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecovera-

331, 337 (Tex.App.-Texarkana 1999, no pet) (applying abuse of discretion review).

**82.** *Sterling,* 822 S.W.2d at 11.

ble claim that they are so intertwined that they need not be segregated. We modify *Sterling* to that extent.

This standard does not require more precise proof for attorney's fees than for any other claims or expenses. Here, Chapa's attorneys did not have to keep separate time records when they drafted the fraud, contract, or DTPA paragraphs of her petition; an opinion would have sufficed stating that, for example, 95 percent of their drafting time would have been necessary even if there had been no fraud claim.[83] The court of appeals could then have applied standard factual and legal sufficiency review to the jury's verdict based on that evidence.

There may, of course, be some disputes about fees that a trial or appellate court should decide as a matter of law. For example, to prevail on a contract claim a party must overcome any and all affirmative defenses (such as limitations, *res judicata*, or prior material breach), and the opposing party who raises them should not be allowed to suggest to the jury that overcoming those defenses was unnecessary. But when, as here, it cannot be denied that at least some of the attorney's

fees are attributable only to claims for which fees are not recoverable, segregation of fees ought to be required and the jury ought to decide the rest.

Chapa's failure to segregate her attorney's fees does not mean she cannot recover any. Unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be.[84] We have applied this same rule for lost profits, medical expenses, and attorney's fees—an unsegregated damages award requires a remand.[85] Accordingly, remand is required.

## V. Conclusion

Because the jury found in Chapa's favor on all her claims, she is entitled to recover on the most favorable theory the verdict would support. But she is not required to make that election until she knows her choices.[86]

Under either fraud or the DTPA, Chapa is entitled to $7,213 in economic damages and $21,639, in mental anguish. The court of appeals must reassess her exemplary damages, and a jury must reassess her attorney's fees. There is no rule establish-

---

**83.** *See, e.g., Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex.1997) (noting that claimant's attorney "testified that approximately twenty-percent of his time and fifteen-percent of his paralegal's time concerned issues predating the agreed judgment"); *Med. Specialist Group, P.A. v. Radiology Assocs., L.L.P.*, 171 S.W.3d 727, 738 (Tex.App.-Corpus Christi 2005, pet. denied) ("In his affidavit, Radiology Associates' counsel... testified that his fees for the defense of the case totaled $460,087.00, and approximately forty percent of these fees were directly related to Saratoga's antitrust claims."); *Flagship Hotel*, 117 S.W.3d at 566 n. 7 ("Flagship argues that the segregation standard is difficult to meet. We disagree and note that segregated attorney's fees can be established with evidence of unsegregated attorney's fees and a rough percent of the amount attributable to the breach of contract claim. *Schenck v. Ebby Halliday*

*Real Estate, Inc.*, 803 S.W.2d 361, 369 (Tex. App.-Fort Worth 1990, no writ); *accord, Bradbury v. Scott*, 788 S.W.2d 31, 40 (Tex. App.-Houston [1st Dist.] 1989, writ denied).").

**84.** *See Sterling*, 822 S.W.2d at 12.

**85.** *See Minnesota Mining and Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 739 (Tex.1997) (lost profits); *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 840–41 (Tex.1997) (medical expenses); *Sterling*, 822 S.W.2d at 11–12 (attorney's fees).

**86.** The dissent suggests Chapa must elect between her fraud, contract, and DTPA claims *before* knowing what amount of attorney's fees she might recover. This would defeat the principle that she is entitled to recover on the most favorable theory the verdict supports. *See* n.7, *supra*.

ing which should go first, but for practical reasons we remand first to the court of appeals. At the trial level, the most Chapa could recover under the DTPA would be additional damages of $21,639 (three times her economic damages) plus attorney's fees of something less than $20,000 (depending on the new verdict). If the court of appeals' reassessment of exemplary damages for fraud exceeds this amount, Chapa would obviously be better off electing that recovery; if not, then the court of appeals should thereafter remand to the trial court for a new trial on attorney's fees. Accordingly, we remand to the court of appeals for further proceedings consistent with this opinion.

Justice JOHNSON filed a concurring opinion.

Justice O'NEILL filed a dissenting opinion.

Justice MEDINA did not participate in the decision.

Justice JOHNSON, concurring.

I concur in the Court's judgment, and, except for part III.B. as to Exemplary Damages, I join its opinion.

The court of appeals properly identified *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) and *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) as guiding authorities for its review of the $250,000 exemplary damages jury award. It then concluded that $125,000 exemplary damages is constitutionally permissible under this record. That amount is between 4.33 and 4.34 times the actual damages of $28,852 found by the jury. The court of appeals' analysis as to the exemplary damages issue is not as detailed as that in this Court's opinion. But, because the court of appeals did not give a detailed explanation

for its conclusion does not mean that its conclusion is wrong.

The United States Supreme Court has not set a bright line constitutional limit for exemplary damages. Some of its specific language bears reviewing:

> We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards *exceeding* a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip*, in upholding a punitive damages award, we concluded that an award of *more than four times* the amount of compensatory damages *might be close* to the line of constitutional impropriety. 499 U.S. at 23–24, 111 S.Ct. 1032. We cited that 4-to-1 ratio again in *Gore*. 517 U.S. at 581, 116 S.Ct. 1589. The Court further referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.,* at 581, and n. 33, 116 S.Ct. 1589. While *these ratios are not binding, they are instructive.* They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.,* at 582, 116 S.Ct. 1589, or, in this case, of 145 to I.

> Nonetheless, because *there are no rigid benchmarks that a punitive damages award may not surpass,* ratios greater than those we have previously upheld may comport with due process [under certain circumstances].

*Campbell,* 538 U.S. at 425, 123 S.Ct. 1513 (emphasis added).

The Court says that "The court of appeals' judgment at least pushes against, if not exceeds the constitutional limits." 212 S.W.3d 310. A ratio of 4.33 to 1 is clearly close to the ratio of 4 to 1 which "might be close to the line of constitutional impropriety." *Campbell*, 538 U.S. at 425, 123 S.Ct. 1513. But, there are no rigid constitutional benchmarks that an exemplary damages award may not surpass. *Id.* Unless we determine that the court of appeals misapplied the standards enunciated by the Supreme Court, however, I consider a 4.33 ratio of exemplary damages to actual damages under this record to be within the discretion lodged in the court of appeals to determine the amount of remittitur to suggest. I would remand to the court of appeals for reconsideration of the exemplary damages issue and more complete explanation of its analysis as to the remittitur. I would not instruct the court of appeals, at this juncture, that it should determine a different, more appropriate, remittitur.

Justice O'NEILL, dissenting.

Nury Chapa's allegations describe what amounts to a bait-and-switch by Gullo Motors, a claim the jury and this Court agree there is evidence to support. The evidence shows that, in furtherance of that scheme, Chapa was threatened, lied to, and her signature and that of her deceased husband were forged. The defendant's conduct in this case was at best reprehensible, and bordered on criminal, prompting the jury to award $250,000 in exemplary damages. Texas law capped that award at $200,000, and the court of appeals further reduced it by remittitur to $125,000. Even though the remitted award is well below the statutory ceiling that the Legislature set, the Court today decides the appeals court award is exorbitant and cannot stand. I do not agree that the court of appeals violated constitutional exorbitancy standards by suggesting the remittitur

that it did, nor do I agree with the Court's advisory determination of the attorney's fee issue. Accordingly, I respectfully dissent.

## I. Background

The evidence supporting the verdict in this case demonstrates that Chapa purchased a Toyota Highlander Limited from Gullo Motors, but Gullo Motors tried to make her accept instead a less expensive Toyota Highlander. According to Chapa, she offered her salesman, Brien Garcia, $30,000 for the Highlander Limited on the showroom floor, with the added options of a TV/VCR and Michelin tires. After consulting with management, Garcia responded that the showroom car had been sold but he could get her one for $207.38 more. Chapa agreed, but when she returned to sign the contract it only indicated she was buying a "2002 Toyota." Chapa wrote "Limited," "Michelin tires," "TV" and "VCR" on the contract and then signed it. She was told more signatures were needed and a copy would be mailed to her. Chapa never received the contract.

After sending in her $30,207.38 payment, Chapa received a call informing her that the vehicle had arrived. Chapa went to pick it up, but Garcia presented her with a Highlander, not a Highlander Limited. When Chapa refused to take it, Garcia acknowledged that she had purchased a Highlander Limited and assured her she would get one.

Again, a sales representative called Chapa to say her car was ready, and again a Highlander, not a Highlander Limited, was presented to her. Chapa complained, but Gullo told her the Highlander she was taking had a V–6 engine just like the Limited; in addition, Gullo promised to add the other features from the Limited, plus the Michelin tires, and assured her the modifications would be complete in two

days. Chapa agreed to take delivery of the Highlander, but insisted Gullo Motors write these promises on her new delivery check sheet, which she then signed. Garcia wrote her a "We Owe" form, which stated Gullo owed her Michelin tires and lumbar seats. He did not include the other items, so Chapa listed them on the delivery check sheet; she testified Garcia told her that was enough.

When Gullo Motors failed to install the promised items, Chapa went to the dealership to speak with Brian Debiski, the sales manager. Debiski told Chapa she was "crazy, that [she] didn't buy that [Limited]." Chapa explained that she had a "We Owe" form, but Debiski responded, "[Y]ou have nothing. You are a nobody. It's your word against me." When Chapa told him she would inform the media, Debiski responded that "nobody will dare to go against me, against us," and informed Chapa that he would show her by having her car towed away at her expense.

Later, when Chapa's attorney informed the dealership that Chapa would like to return the car for a refund, Gullo refused, claiming the Highlander had already been titled to Chapa (even though it had not) and explaining that it would thus have to sell the car as used. Gullo produced a New Vehicle Delivery Check Sheet showing Chapa had accepted delivery of the Highlander without complaint. However, Chapa testified that Gullo forged her deceased husband's signature on the delivery check sheet by using documents her late husband, Ernesto Chapa, had signed when they had previously bought a car from Gullo. Chapa also claimed that Gullo forged her deceased husband's signature on the "We Owe" form. Chapa testified that numerous other documents were forged, and there was evidence that Garcia admitted to Gullo he had promised Chapa the features listed on the "We Owe" form.

The jury found Chapa's evidence credible and awarded her $7,213 for breach of contract (the difference in value between the vehicle promised and the one delivered), $7,213 for fraud, $21,639 for mental anguish, $250,000 for exemplary damages, $7,213 for damages under the Texas Deceptive Trade Practices Act, and $20,000 for attorney's fees. The trial court rendered judgment only on the breach of contract claim, but the court of appeals reversed and reinstated all the awards except for exemplary damages, which the court remitted to $125,000, one-half of what the jury awarded.

I agree with the Court that Chapa must elect only one liability theory upon which to recover, and the court of appeals erred to the extent it concluded otherwise. But I disagree that the court of appeals' remittitur is constitutionally infirm or that Chapa's attorney's fees are capable of segregation.

## II. Exemplary Damages

In Texas, the amount of exemplary damages for which a defendant may be liable is capped at

> an amount equal to *the greater of*:
> (1) (A) two times the amount of economic damages; plus
>
> (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000; or
> (2) $200,000.

TEX. CIV. PRAC. & REM. CODE § 41.008(b) (emphasis added). I agree with the Court that the mere existence of a statutory cap does not foreclose a federal constitutional check for exorbitancy. But the United States Supreme Court has instructed that reviewing courts should accord "substantial deference" to legislative judgments concerning appropriate sanctions. *BMW of N. Am. v. Gore*, 517 U.S.

559, 583, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). "[A] punitive damages award that comports with a statutory cap provides strong evidence that a defendant's due process rights have not been violated." *Rodriguez–Torres v. Caribbean Forms Mfr., Inc.*, 399 F.3d 52, 65 (1st Cir.2005) (citing *Romano v. U–Haul Int'l*, 233 F.3d 655, 673 (1st Cir.2000)). The award the Court finds excessive today is well below the statutory cap that the Legislature determined appropriate when a defendant engages in conduct that would support an exemplary damages award. Neither does the award violate the three-part test for constitutional exorbitancy that the United States Supreme Court has articulated. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418–19, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

Courts must consider three guideposts when reviewing an exemplary damage award: (1) the degree of reprehensibility of the misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil or criminal penalties that could be imposed for comparable misconduct. *Id.; Gore*, 517 U.S. at 575, 116 S.Ct. 1589. According to the Supreme Court, it is "the degree of reprehensibility of the defendant's conduct" that is "[t]he most important indicium of the reasonableness of a punitive damages award," and five factors guide that assessment: (1) whether the harm caused was physical rather than economic, (2) whether the conduct evinced an indifference to others' health or safety, (3) whether the harm involved repeated acts or isolated incidents, (4) whether the target of the conduct was financially vulnerable, and (5) whether the harm resulted from mere accident or from "intentional malice, trickery, or deceit ...." *Campbell*, 538 U.S. at 419, 123 S.Ct. 1513.

The Court summarily concludes that only the last of these factors, deceitful conduct, favors Chapa. And the Court gives that conduct very cursory attention, even though the Supreme Court has said that the "infliction of economic injury, *especially when done intentionally through affirmative acts of misconduct ...* can warrant a substantial penalty." *Gore*, 517 U.S. at 576, 116 S.Ct. 1589 (citing *TXO Prod. Corp. v. Alliance Res. Corp.* 509 U.S. 443, 453, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). Assuming Chapa elected to recover on the jury's fraud finding, she would be entitled to $28,852 in compensatory damages. Thus, the penalty the court of appeals determined to be appropriate reflects a ratio between compensatory and exemplary damages of a little more than 4 to 1, a differential the petitioners have not demonstrated is constitutionally disproportionate to the defendant's conduct here. *See TXO Prod. Corp.*, 509 U.S. at 462, 113 S.Ct. 2711 (holding a 10 to 1 ratio permissible); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991) (affirming award of four times compensatory damages and two hundred times economic damages); *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1095–96 (5th Cir.1991) (upholding a 20 to 1 ratio).

As for the other reprehensibility factors, the Court either misapplies them or gives them short shrift. For example, the Court's conclusion that Gullo's actions caused Chapa only economic harm ignores the jury's award of mental anguish damages, a damage element we have long considered non-economic that compensates for harm with physical elements. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 763 (Tex.2003). The Court also concludes Gullo Motors' misconduct was an isolated incident that did not involve repeated acts, even though the evidence indicates otherwise. Gullo Motors committed

multiple acts of misconduct, including switching contracts, altering documents, engaging in deceptive and threatening behavior, and even forging the signatures of Chapa and her deceased husband. In sum, the factors that the Court purports to follow in determining the reprehensibility of Gullo Motors' conduct weigh in favor of the court of appeals' remitted award, not against it.

The second guidepost used to review an exemplary damage award examines the ratio between exemplary and compensatory damages. The Supreme Court has refused to adopt a bright-line constitutionally prohibited ratio. Instead, it has suggested a range beyond which exemplary damage awards will likely become constitutionally exorbitant, stating "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell,* 538 U.S. at 419, 123 S.Ct. 1513. The Court's opinion in this case highlights a 17 to 1 ratio that reflects a comparison between the remitted award and *economic* damages. The constitutionally relevant comparison, though, focuses on *compensatory* rather than economic damages, which yields a much lower 4.33 to 1 ratio.

The third guidepost considers civil or criminal penalties that could be imposed for comparable misconduct. *Campbell,* 538 U.S. at 418, 123 S.Ct. 1513; *Gore,* 517 U.S. at 575, 116 S.Ct. 1589. The Court considers two potential civil penalties of $10,000 and $20,000 that Gullo Motors' conduct might subject it to, yet declines to consider potentially applicable criminal penalties that, according to Chapa, would result in jail time and $80,000 in felony fines for forgery, document destruction, and fraudulently inducing signatures. Certainly I agree that "the remote possibility of a criminal sanction does not automatically sustain a punitive damages award," as the Court recites, but that doesn't mean comparable potential criminal sanctions should be altogether ignored. *Campbell,* 538 U.S. at 428, 123 S.Ct. 1513.

In my view the more important issue is not the actual dollar amount that Chapa will ultimately recover, but the low threshold this Court steps over to declare a jury award constitutionally exorbitant. Had I been on the jury in this case, I may well have disagreed with the amount of exemplary damages the jury actually awarded or even the amount the appellate court suggested in its remittitur. Although exemplary damage awards can serve worthwhile purposes, they can also have debilitating economic impact and should be carefully policed by the courts. *See Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 31 (Tex.1994). Our courts of appeals in Texas have long been empowered to suggest a remittitur of excessive awards when the evidence is factually insufficient to support them. *Id.;* TEX. R. APP. P. 46.3. The court of appeals assiduously exercised that power in this case. It is, of course, appropriate for this Court to intervene if the appeals court allows a constitutionally offensive award to stand. But when the Court chooses a marginal case like this in which to intervene, it risks intruding upon an area that has traditionally been the well-patrolled province of our courts of appeals. And when, as here, the Legislature has chosen to set its own parameters for such awards, the Court's intrusion is even more disturbing.

### III. Attorney's Fees

I also question the Court's decision to address the attorney's fee issue in this case. If the court of appeals renders judgment on remand based on the jury's fraud finding, the attorney's fee issue will be moot. Thus, the Court's analysis of the issue is purely advisory. TEX. CONST. art. II, § 1; *Brooks v. Northglen Ass'n,*

141 S.W.3d 158, 164 (Tex.2004). But even assuming the Court properly reaches the issue, I disagree with the Court's application of the rule it announces. According to the Court, when the legal services themselves advance both a recoverable and unrecoverable claim, segregation is not required. The Court concludes that at least some of Chapa's attorney's fees are attributable only to claims for which fees are not recoverable, requiring a new trial. It is true that some of Chapa's attorney's fees are attributable to her common-law fraud claim for which fees are not recoverable. Attorneys fees are recoverable, though, under the DTPA for deceptive acts or practices. It is unclear to me, and the Court does not explain, how the legal services used to advance Chapa's DTPA claim did not also advance her common-law fraud claim.

The court's charge that was read to the jury instructed that Gullo Motors violated the DTPA if it (1) breached an express warranty, defined as any affirmation of fact that related to the 2002 Highlander Limited and became part of the basis of its bargain with Chapa, or (2) engaged in any false, misleading, or deceptive act or practice upon which Chapa relied to her detriment. A false, misleading, or deceptive act or practice includes representing that goods or services are of a particular standard, quality, grade, or of a particular style or model, or, failing to disclose information concerning goods which was known at the time of the transaction if such failure to disclose was intended to induce the consumer into a transaction the consumer would not have entered had the information been disclosed. As for the common-law fraud claim, the jury was instructed that Gullo Motors committed fraud if (a) it made a material misrepresentation, (b) the representation was made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion, (c) the representation was

made with the intention that Chapa would act upon it, and (d) Chapa relied on the misrepresentation and thereby suffered injury. The evidence that Chapa presented to support her fraud claim also supported her DTPA claim, and vice versa. Because the legal services provided to advance the DTPA claim also advanced the fraud claim, the fees incurred cannot be segregated even under the Court's own analysis.

\* \* \* \* \* \*

For the reasons expressed, I respectfully dissent.