In The



Court of Appeals



Ninth District of Texas at Beaumont



 ______________________ 


 

NO. 09-06-114 CV


 ______________________


 

ENDOVASC, INC. A/K/A ENDOVASC LTD., INC., Appellant



V.



THE DOW CHEMICAL COMPANY, Appellee






On Appeal from the 359th District Court


 Montgomery County, Texas


Trial Cause No. 03-08-06181 CV






MEMORANDUM OPINION
 Endovasc, Inc. a/k/a Endovasc Ltd., Inc. appeals from a final judgment rendered in
favor of The Dow Chemical Company. Endovasc brings five issues for appellate review. 
In its first two issues, Endovasc argues the trial court erred in denying leave to proceed with
its counterclaim. In issue three, Endovasc asserts there was no evidence to support the jury's
finding that Endovasc and Collective BioAlliance (CBA) agreed to the amendment of the
biomanufacturing agreement. In issue four, Endovasc argues there is no evidence to support
the jury's finding that it failed to comply with the biomanufacturing agreement. In issue five,
Endovasc argues the evidence was insufficient to support the award of attorney's fees. 
Finding no reversible error, we affirm the trial court's judgment. 

 Endovasc, a biotechnology company, and CBA, a company that develops and
manufactures liposomes, entered into a biomanufacturing agreement. CBA agreed to
manufacture a batch of liposome product based on a recipe provided by Endovasc. CBA was
to provide the batch of liposome product to Endovasc for Endovasc to use in clinical trials. 

 CBA initially produced two batches of the product, labeled batch 501 and batch 502. (1)
CBA produced a third batch of product, labeled batch 503. Endovasc paid for batches 501
and 502. Dow, who acquired CBA, brought a breach of contract and quantum meruit suit
against Endovasc to recover the amount of the unpaid invoices for batch 503. 

 The trial court issued a scheduling order that set the deadline for filing amended and
supplemental pleadings for February 4, 2004. (2) On April 20, 2004, Endovasc filed a
counterclaim against Dow for breach of contract and fraud. The trial was originally set for
May 3, 2004, but was reset for August 23, 2004. Endovasc filed a first amended
counterclaim on July 22, 2004, and on August 9, 2004, Endovasc filed a motion to proceed
with its counterclaim. On August 23, 2004, the trial court signed an order denying the
motion. 

 A jury found that Endovasc failed to comply with the biomanufacturing agreement as
amended. The jury also found in favor of Dow on its alternative quantum meruit claim. The
jury found that a reasonable fee for the necessary services of Dow's attorneys was $95,000
for preparation and trial, and $20,000 for an appeal. The trial court signed a judgment
awarding Dow $67,000 in damages for breach of contract and $95,000 in attorney's fees. (3) 

 In its first issue, Endovasc argues that the trial court should have allowed the
counterclaim because it was compulsory. Endovasc argues in its second issue that the trial
court's scheduling order did not apply to counterclaims because it only set deadlines for
amended and supplemental pleadings. We do not accept either argument. The scheduling
order deadline in effect prevented the parties from raising new issues for trial. The pleading
asserting the counterclaim raised new issues. A party must obtain leave of court to file an
amended pleading after the pleading deadline set in a scheduling order. See Tex. R. Civ. P.
63; ForScan Corp. v. Dresser Indus., Inc., 789 S.W.2d 389, 393 (Tex. App.--Houston [14th
Dist.] 1990, writ denied); see also G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co., 177
S.W.3d 537, 542-43 (Tex. App.--Dallas 2005, no pet.). Generally, the trial court should not
refuse permission to amend a pleading unless (1) the opposing party submits evidence of
prejudice or surprise, or (2) the amendment introduces a new cause of action or defense, is
prejudicial on its face, and the opposing party objects. Greenhalgh v. Serv. Lloyds Ins. Co.,
787 S.W.2d 938, 939 (Tex. 1990); see also ForScan Corp., 789 S.W.2d at 393. When the
trial court refuses to allow an amended pleading that introduces a new substantive matter, the
burden is on the party who offered the amendment to demonstrate on appeal that the trial
court abused its discretion. Hardin v. Hardin, 597 S.W.2d 347, 349-50 (Tex. 1980).

 Endovasc's counterclaim asserted breach of contract and fraud. (4) Endovasc asserted
the claims for the first time in the untimely pleading. Dow asserts that when the
counterclaim was filed, discovery had been completed and Dow was preparing for trial. 
Under the circumstances, the trial court may have determined, with reason, that the new
substantive matters asserted in the counterclaim were not anticipated by Dow and, if
permitted to be asserted untimely, may have prejudiced the presentation of the case or
resulted in unnecessary delay. See Hardin, 597 S.W.2d at 350. 

 Endovasc asserts that the counterclaim is compulsory because the claim arises from
the parties dealings under the original agreement. A compulsory counterclaim arises out of
the same occurrence or transaction that is the subject matter of the opposing party's claim,
and is one that is mature and owned by the defendant at the time it files its answer. Ingersoll-Rand Co. v. Valero Energy Corp., 997 S.W.2d 203, 207 (Tex. 1999). A claim is mature
when the claim accrues. Id. Endovasc alleged Dow did not perform the work the parties
agreed upon and Dow engaged in actions that negatively affected the development of the
project. Endovasc's claims matured when Dow allegedly breached the original agreement. 
The claim accrued before the court-imposed deadline for filing amended pleadings. 
Endovasc has offered no explanation in its brief for the late filing of the claims. Endovasc
argued to the trial court that it filed the counterclaim based on the discovery obtained but did
not explain why Endovasc did not file the counterclaim until two months after the discovery
and pleading deadlines. Under the circumstances, Endovasc has not shown that the trial
court abused its discretion in denying leave to proceed with the counterclaim after the
deadlines in the scheduling order. We overrule issues one and two.

 In its third issue, Endovasc argues that because Endovasc did not sign the amendment
to the contract, the evidence is legally insufficient to support the jury's finding that it agreed
to the amendment. Endovasc also argues that the entire record shows that the jury's finding
is so against the great weight and preponderance of the evidence as to be manifestly unjust. 
Endovasc asks this Court to reverse and remand for a new trial. We understand Endovasc's
argument to be a challenge to the legal and factual sufficiency of the evidence that it agreed
to the amendment.

 If one party signs a contract, the other party may accept the terms of the contract by
acts, conduct, or acquiescence, binding both parties. Velasquez v. Schuehle, 562 S.W.2d 1,
3 (Tex. Civ. App.--San Antonio 1977, no writ). A binding contract may be found when one
party signs the contract, the terms of the contract are performed, and the benefits under the
contract are accepted. Rubin v. Polunsky, 366 S.W.2d 234, 236 (Tex. Civ. App.--San
Antonio 1963, writ ref'd n.r.e.).

 Susan Dexter, the former vice president of business development at CBA and current
vice president of business development at Dow, testified that Endovasc wanted to increase
the dose of Prostaglandin E-1 used to produce batch 502 under the original agreement. The
amendment provided for the development of batch 503, which would be developed using the
higher concentration. Dexter drafted the amendment and the amendment was delivered to
Endovasc. CBA signed the amendment but Endovasc did not. Endovasc and CBA engaged
in extensive correspondence concerning the higher concentration of Prostaglandin E-1 that
would be used to develop batch 503. Dexter testified that CBA performed work in
preparation for batch 503, CBA sent Endovasc an invoice for the work, and Endovasc paid
the invoice for the initial work performed to develop batch 503. She testified that CBA
completed its development of batch 503. The batch was delivered to a particular location as
Endovasc instructed. Endovasc signed a Certificate of Analysis and noted that batch 503
passed all specifications. 

 Diane Dottavio, president and CEO of Endovasc, testified that Endovasc subsequently
used batch 503 in clinical trials. Dottavio testified that Endovasc did not receive batch 502,
and Endovasc did not go forward with its plans for batch 502. She testified that there were
problems with batch 502 and the batch had turned yellow. Dottavio also testified that the
recipe Endovasc provided to CBA specified that a certain amount of Prostaglandin E-1 be
used in the batch, but CBA informed Endovasc that it put in half the required amount. She
testified that Dr. David Watkins, CBA's former senior director of project development and
Dow's current director of process development, recommended that another batch be
developed. She explained that Endovasc thought the new batch would replace batch 502
because Endovasc did not get what it contracted for and would not be refunded any money. 
She testified that Endovasc assumed that when CBA said they would make another batch,
CBA meant that they would replace the batch. She also testified that because CBA made a
product that did not contain enough Prostaglandin E-1, it was clear to Endovasc that CBA
had to make another batch. Dottavio testified that Endovasc did not agree to pay for batch
503. 

 Dwight Cantrell, Endovasc's chief financial officer, testified that Endovasc rejected
batch 502, and CBA did not refund Endovasc's money. (5) Cantrell acknowledged that
Endovasc sent the letter rejecting batch 502 after Endovasc had already determined that batch
503 had passed specifications. Cantrell testified that CBA partially replaced the product but
did not provide a complete product of batch 503. He testified that CBA was supposed to
provide twenty liters of batch 503 but only provided five liters. He explained that the
amendment had no effect because CBA should have been replacing batch 502 under the
original agreement. He testified that because CBA did not produce batch 502, it owed
Endovasc batch 503. 

 Dexter, CBA's former vice president, testified that the amount of Prostaglandin E-1
in batch 502 was not a specification. She testified that CBA completed batch 502, released
the batch to Endovasc, and notified Endovasc of the release. She explained that once CBA
released the product, Endovasc owned it. CBA noted on the Certificate of Analysis that
batch 502 conformed with the specifications. Dexter explained that the batch was to remain
on CBA's premises until Endovasc provided CBA with shipping instructions, but Endovasc
did not provide CBA with a location for delivery. CBA satisfied its obligations for delivery
of the product to Endovasc. Dexter testified that CBA did not receive a written rejection for
batch 502 until a year and ten months after batch 502 had been completed, and after batch
503 had already been completed.

 Dr. Watkins, CBA's former senior director of product development, testified that four
months after batch 502 remained in storage, it had turned yellow. Watkins explained that by
the time the batch had turned yellow, the batch still had not been shipped because CBA was
waiting for Endovasc to provide shipping instructions. He testified that when batch 502 was
tested within weeks of its manufacture, it did not have the yellow color. He indicated that
a number of factors could have been involved in the color change, and had no reason to
believe that there was anything wrong with the batch. Endovasc did not request that the
batch be tested to determine the cause of the color change. Watkins recommended to
Endovasc that a fresh batch be developed because it was four months old. He proposed that
no changes be made to the manufacturing methods or to the recipe that Endovasc provided. 
Endovasc did not like the results they were getting from the process used in the original
agreement and requested that a new batch of product be developed. Watkins suggested that
batch 503 contain twenty liters of Prostaglandin E-1, but Endovasc asked that the
concentration be reduced to five liters because five liters would be sufficient. He testified
that during the planning for batch 503, there was no discussion that batch 503 would be a
replacement for batch 502.

 Dexter explained that CBA began doing work on batch 503 before waiting for the
amendment to be signed because the project required the parties to move forward and the
amendment "was just tidying up the details." She was not concerned when Endovasc did
not return the amendment because the parties had an open working relationship. She testified
that when there is a signed agreement, "it is customary and standard practice to continue on
in amendments in good faith because of the nature of the work that's trying to be completed
and the speed at which the clinical trials are usually under[.]" Dexter explained that
amendments are usually signed "after the fact." She testified that she had a conversation
with Endovasc's former CEO, who she claims intended to sign the amendment, but Dexter
was never able to reach him. 

 While the evidence was conflicting, it is sufficient to establish an agreement to the
amendment. Endovasc accepted the terms of the amendment as evidenced by its
correspondence with Dow regarding batch 503, by paying for the initial preparation of batch
503, and by accepting batch 503 and using the batch in clinical trials. The trial court's
judgment based on the amendment is supported by the record. We overrule issue three. 

 In issue four, Endovasc argues the evidence is legally insufficient to support the jury's
finding that it breached the biomanufacturing agreement. Endovasc contends it complied
with the biomanufacturing agreement because it paid for batch 502. Endovasc argues that
the jury's finding is so against the great weight and preponderance of the evidence as to be
manifestly unjust. We understand this issue to challenge the legal and the factual sufficiency
of the evidence of a breach of contract.

 A modification to a contract creates a new contract that includes the modified
provisions and the unchanged provisions. Boudreaux Civic Ass'n v. Cox, 882 S.W.2d 543,
547-48 (Tex. App.--Houston [1st Dist.] 1994, no writ). The development of batch 503 was
provided for in the additional stages of the amendment. Endovasc accepted batch 503 and
paid for the initial preparation of the batch. Endovasc was bound by the terms of the
amendment to the biomanufacturing agreement. The contract included the modified
provisions of the amendment, which required Endovasc to pay for batch 503. It is undisputed
that Endovasc did not pay the remaining invoices relating to batch 503. Endovasc failed to
comply with the biomanufacturing agreement as amended. Issue four is overruled.

 In issue five, Endovasc argues the amount of attorney's fees awarded to Dow was not
supported by the evidence, was excessive in relation to the complexity of the case, exceeded
the amount of damages, and was not reasonably related to the amount in controversy. (6) Dow
recovered on its claim for a written contract and is entitled to reasonable attorney's fees. See
Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 1997). Considerations in
determining the reasonableness of a fee award include the time and labor required, the
novelty and complexity of the issues involved, the skill required to perform the legal service
properly, the fee customarily charged in the locality for similar legal services, the amount
involved and the results obtained, and the experience, reputation, and ability of the lawyers
performing the services. Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818
(Tex. 1997). The amount of damages awarded is one factor in determining the
reasonableness of an attorney's fee award. Cordova v. Sw. Bell Yellow Pages, Inc., 148
S.W.3d 441, 448 (Tex. App.--El Paso 2004, no pet.). An award is not excessive merely
because it exceeds the damages. See id. Endovasc's attorney testified that after reviewing
the bills submitted by Dow, he concluded that the charges were not the usual, reasonable, and
customary charges for like or similar services. 

 Dow's supervising attorney testified that this case involved lengthy pre-trial matters
that included numerous motions, a motion for summary judgment, motions to compel the
production of documents, and pleadings filed by both parties. Counsel testified that the fee
range incurred by Dow was between $165-$185 an hour, and that this amount was fair and
reasonable. Dow's attorneys spent approximately 450 hours preparing this case. Counsel
indicated that as supervising attorney, his rate is approximately $270 or $300, but that the
bills submitted did not include the seventy or eighty hours of his time spent as supervising
attorney. The bills included approximately 135 hours of work performed by a legal assistant
at a rate of $145 an hour. Counsel testified that including fees for the use of a legal assistant
was customary, and the work done was reasonable and necessary to the case. Counsel
indicated the bills did not reflect work done during the trial. Counsel explained that although
the total attorney's fees were approximately $100,000, a reasonable fee in this case would
be $90,000. This amount did not include firm expenses or fees that may be incurred in the
future. Counsel testified that a reasonable attorney's fee on appeal would be $20,000, for a
total fee of $110,000.

 The trial court's judgment awarded Dow a total of $95,000 in attorney's fees. The
evidence is sufficient to support the award of attorney's fees in this case. Considering the
factual dispute and issues involved, the dispute concerning the existence of the amended
agreement, the result obtained, the skill required, and the amount of time involved in the
preparation for and presentation of the case to the jury, the award of attorneys fees is not
excessive under the circumstances. We overrule issue five.

 The trial court's judgment is affirmed.

 AFFIRMED.

 _________________________________ 
 DAVID GAULTNEY

 Justice


Submitted on June 14, 2007

Opinion Delivered December 13, 2007


Before Gaultney, Kreger, and Horton, JJ.
1. Batch 502 was the batch prepared under the original agreement and batch 501 was a test
batch.
2. Endovasc provided a copy of the scheduling order with its brief. The parties agree that
the trial court issued the scheduling order attached to Endovasc's brief.
3. Dow does not complain of the lesser amount of attorney's fees in the judgment.
4. Dow filed objections to the counterclaim. 
5. The agreement required Endovasc to conduct tests immediately upon receipt of the batch. 
If the tests showed that the product failed to meet specifications, Endovasc had to give CBA written
notice within twenty-eight days of delivery and return the product. In the absence of written notice,
the product would be deemed to have been accepted by Endovasc as meeting specification.
6. Endovasc did not contend in the trial court, and does not complain in its brief, that
because Dow could not recover both quantum meruit and breach of contract damages, Dow
was not entitled to recover any attorney's fees incurred in the pursuit of the quantum meruit
claim. See generally Vortt Exploration Co. v. Chevron U.S.A., Inc., 787 S.W.2d 942, 944
(Tex. 1990) (noting that a party generally cannot recover damages under quantum meruit if
there is a valid contract covering the services rendered). Endovasc did not object to the jury
question permitting the jury to determine a reasonable fee for the entire case. Compare Tony Gullo
Motors I, L.P. v. Chapa, 212 S.W.3d 299, 310 (Tex. 2006) (defendant objected to jury awarding
attorney's fees for entire case when fees were not recoverable for fraud claim); with Matthews v.
Candlewood Builders, Inc., 685 S.W.2d 649, 650 (Tex. 1985) (defendant failed to object to special
issue on attorney's fees that allowed jury to find attorney's fees for the entire case).