*Court Of Appeals*
*Fourth Court of Appeals District of Texas*
*San Antonio*


# OPINION

No. 04-07-00689-CV
No. 04-08-00372-CV

**BIOPOLYMER ENGINEERING, INC**. d/b/a Biothera,
Appellant

v.

**IMMUDYNE, INC.**, A Delaware Corporation,
Appellee

From the 285th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2007-CI-14719; 2005-CI-16991
Honorable Michael Peden, Judge Presiding[1]

Opinion by:     Sandee Bryan Marion, Justice

Sitting:        Sandee Bryan Marion, Justice
                Phylis J. Speedlin, Justice
                Marialyn Barnard, Justice

Delivered and Filed:   June 17, 2009

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

        This is an appeal from a summary judgment and a declaratory judgment in favor of appellee.

We reverse, in part, the summary judgment and remand for further consideration.  We also reverse,

---

[1] The Honorable David Berchelmann granted the motion for summary judgment at issue in appeal cause number 04-07-00689-CV.  The Honorable Michael Peden presided over the jury trial and rendered the final judgment at issue in appeal cause number 04-08-00372-CV.  The appeals were consolidated by order of this court.

in part, the declaratory judgment and remand for further consideration. In all other respects, we affirm both judgments.

## BACKGROUND

The underlying declaratory judgment action involves seven patents: (1) U.S. Patent No. 5,576,015 ("the '015 patent"), (2) U.S. Patent No. 5,702,719 ("the '719 patent"), (3) U.S. Patent No. 5,705,184 ("the '184 patent"), (4) U.S. Patent No. 5,519,009 ("the '009 patent"), (5) U.S. Patent No. 5,397,773 ("the '773 patent"), (6) Europatent No. 0,500,718 B1; and (7) Canadian Patent 2072145C (collectively, "the disputed patents").[2] The dispute centers on which entity – Biopolymer Engineering, Inc. d/b/a Biothera ("Biothera") or ImmuDyne, Inc. ("ImmuDyne") – acquired licenses and ownership of the disputed patents. The underlying action has its origin in a 1994 shareholder derivative lawsuit filed by Mark McLaughlin and Tom McCarvill against ImmuDyne, Byron Donzis, and others ("the Derivative Lawsuit"). Following are the events leading to that lawsuit, as well as to the underlying declaratory judgment lawsuit.

In February 1979, U.S. Patent No. 4,138,479 ("the '479 patent") issued to Byron Donzis. On July 31, 1986, Donzis issued an exclusive license to the '479 patent to Carmel Research, Inc. ("Carmel"). Carmel, in turn, licensed the '479 patent to ImmuDyne. On June 29, 1993, U.S. Patent No. 5,223,491 ("the '491 patent") issued to Donzis. Through a series of licenses, Donzis licensed the '491 patent to Carmel, which, in turn, licensed the '491 patent to ImmuDyne in December 1994.

---

[2] At the time of trial in this case, there was parallel patent infringement litigation over these same patents in Minnesota federal district court.

In October 1996, the Derivative Lawsuit commenced in Texas state court. The plaintiffs alleged Donzis would improperly claim patents developed and paid for by ImmuDyne as his own and then execute license agreements. On October 26, 1996, the lawsuit settled with the parties entering into a Rule 11 Agreement. Shortly thereafter, the plaintiffs and ImmuDyne moved for summary judgment to enforce the Rule 11 Agreement, which was granted in a February 28, 1997 judgment. Following an appeal by Donzis and Carmel, this court reversed and remanded on the grounds that the terms of the summary judgment differed from the terms of the Rule 11 Agreement. *See Donzis v. McLaughlin,* 981 S.W.2d 58, 65 (Tex. App.—San Antonio 1998, no pet.) (reversing and remanding trial court's order because it added terms beyond scope of settlement agreement). On October 19, 1998, the trial court signed a new judgment incorporating the terms of the Rule 11 Agreement ("the October 1998 judgment"). The Rule 11 Agreement "required certain reaffirmations and representations to be made regarding certain patents and related technology that were the subject of existing license agreements between the parties." *Id.* Neither the Rule 11 Agreement nor the October 1998 judgment specified any patent by number.

In the meantime, Donzis applied for and received three patents: the '015 patent, the '719 patent, and the '184 patent. In February 1999, ImmuDyne commenced an action in Texas state court against Donzis for breach of the Rule 11 Agreement. On June 23, 2000, the trial court entered final judgment, awarding ImmuDyne $600,000 plus pre- and post-judgment interest on its breach of contract claim. In 2001, ImmuDyne filed a post-judgment petition against Donzis for equitable relief, asking for turnover of the patents. On December 27, 2001, the trial court ordered Donzis to assign his legal ownership interest in the '491 patent, U.S. Patent No. 5,519,009 ("the '009 patent"),

U.S. Patent No. 5,397,773 ("the '773 patent"), the '015 patent, the '719 patent, the '184 patent, and Europatent No. 0,500,718 B1 to ImmuDyne by December 31, 2001, to satisfy the judgment. If Donzis failed to do so, the trial court authorized a trustee to assign the disputed patents to ImmuDyne. In February 2002, the trustee assigned the patents to ImmuDyne. On April 11, 2002, the trustee's assignments of the patents to ImmuDyne were recorded.

In September 1999, after ImmuDyne commenced its breach of contract lawsuit but before the trial court signed its December 27, 2001 turnover order, Donzis licensed and assigned the disputed patents to Biothera. A few months later, Biothera recorded the licenses. On June 8, 2000, Donzis assigned the '015 patent and the '719 patent to PSA Incorporated. PSA recorded the assignments on June 8, 2000. Approximately seventeen months later, Biothera and PSA entered into an Asset Purchase Agreement. The assets bought by Biothera included all seven of the disputed patents. Biothera recorded the assignments in June 2002.

In October 2005, ImmuDyne brought the underlying action for declaratory judgment in Texas state court against Donzis, PSA, and Biothera. ImmuDyne asked the trial court to "interpret the terms" of the October 1998 judgment on the Rule 11 Agreement and "declare that the language in Paragraph B of the [judgment] refers to and includes" patents '479 and '491 "and the patents related to these patents, including, but not limited to" patents '009, '773, '015, '719; '184; and Europatent No. 0,500,718 B1 and Canadian Patent 2072145C. ImmuDyne also asked the court to declare it as the owner and sole and exclusive licensee of the patents and related technology.

In April 2006, the trial court granted ImmuDyne's motion for partial summary judgment and declared that ImmuDyne "has an exclusive license" to patents '009, '773, '015, '719, and '184.

In 2008, the remaining issues in the lawsuit proceeded to a five-day jury trial. The remaining issues encompassed the parties' dispute over the licenses to the Europatent and the Canadian patent and whether Biothera's status as a bona fide purchaser invalidated ImmuDyne's licenses and ownership of all seven of the disputed patents. At some point, Donzis was dismissed from the case, and during trial, PSA had a directed verdict entered against it.[3] The jury returned a verdict finding that (1) ImmuDyne had sole and exclusive licenses to Europatent No. 0,500,718 B1 and Canadian Patent 2072145C; (2) Biothera did not acquire the patents in good faith, for valuable consideration, and without prior notice of ImmuDyne's interest; and (3) Biothera did license the patents in good faith, for valuable consideration, and without prior notice of ImmuDyne's interest. Following post-judgment motions, the trial court signed the final judgment declaring that (1) ImmuDyne has a sole and exclusive license in Europatent 0,500,718 B1 and Canadian Patent 2072145C; (2) the December 27, 2001 turnover order assigned ownership of all seven disputed patents from Donzis to ImmuDyne; and (3) Biothera did not acquire the seven patents from Donzis in good faith, for valuable consideration, and without prior notice of ImmuDyne's interest. The court also denied any relief sought by Biothera based on its affirmative defenses. Biothera appeals, raising seven issues.

## JURISDICTION & STATUTE OF REPOSE

As a preliminary matter, we first address Biothera's assertion that the trial court lacked subject-matter jurisdiction because ImmuDyne was improperly seeking an interpretation of the prior judgments in this declaratory judgment action. "The purpose of the Uniform Declaratory Judgment Act is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and

---

[3] The directed verdict against PSA was not appealed.

other legal relations." *Martin v. Dosohs I, Ltd.*, 2 S.W.3d 350, 353 (Tex. App.—San Antonio 1999, pet. denied). Declaratory relief is not appropriate to seek a judicial interpretation of a prior judgment or attack or modify a prior judgment. *Id.* However, here, a justiciable controversy exists between the parties. Neither Biothera nor PSA were parties to the prior judgments and ImmuDyne is not seeking to attack or modify the prior judgments. ImmuDyne seeks only to have the trial court uphold its rights under the prior judgments, and any declaration here has no bearing on the validity of those prior judgments. *See Zuniga v. Wooster Ladder Co.*, 119 S.W.3d 856, 864 (Tex. App.—San Antonio 2003, no pet.). Therefore, we conclude the trial court had subject-matter jurisdiction.

Biothera also asserts ImmuDyne's claims are barred by the four-year statute of repose applicable to fraudulent conveyance/transfer claims. *See* TEX. BUS. & COM. CODE ANN. § 24.010(a) (Vernon 2002). However, ImmuDyne never pled and did not argue at trial that the transfer of the licenses or ownership of the patents from Donzis to Biothera or to PSA were fraudulent; therefore, ImmuDyne's request for relief is not time-barred.

## LICENSES TO THE DISPUTED PATENTS

In the summary judgment proceeding, the trial court determined ImmuDyne was the exclusive licensee to five of the patents, and, thereafter, the jury determined ImmuDyne was the exclusive licensee of the remaining two patents. On appeal, Biothera asserts ImmuDyne is not the exclusive licensee of any of the seven disputed patents and, to the extent ImmuDyne did acquire any licenses, those licenses were not exclusive. Biothera's argument is based on its contention that (1) the October 1998 judgment is void; (2) the disputed patents were not "improvements" to the '491

patent; and (3) any licenses granted to ImmuDyne are non-exclusive. For the following reasons, we conclude ImmuDyne has the sole and exclusive license to five of the seven disputed patents.

**A.      ImmuDyne's Motion for Partial Summary Judgment on Five of the Patents**

ImmuDyne moved for a partial summary judgment asserting it was the exclusive licensee of the '009 patent, the '773 patent, the '015 patent, the '719 patent, and the '184 patent because the October 1998 judgment and the Rule 11 Agreement granted ImmuDyne an exclusive license to these five patents as either improvements to or technology related to the '491 patent. As summary judgment proof, ImmuDyne offered a statement made by Donzis in pleadings filed in the Derivative Lawsuit in which Donzis states as follows:

> Pursuant to a series of license agreements, ImmuDyne is the exclusive sublicensee of a number of patents in which Donzis is the inventor. [ImmuDyne] is the exclusive sublicensee under [the '491 patent] . . . and [the '479 patent] . . . through two (2) written license agreements executed in 1994 and 1986, respectively. Under an oral license without terms entered into in 1995, [ImmuDyne] is the sublicensee under [the '009 patent] . . . and [the '015 patent] . . . . [The '773 patent] . . . is owned by [ImmuDyne] as an improvement to the '491 patent . . . .

We conclude this uncontroverted summary judgment evidence supports the trial court's summary judgment that ImmuDyne acquired an exclusive license in the '009 patent, the '015 patent, and the '773 patent.[4]

As to the '719 patent and the '184 patent, we conclude ImmuDyne did not establish as a matter of law that it acquired a license to these two patents. ImmuDyne's only summary judgment proof in support of its argument that these two patents were related to the '491 patent was a single

---

[4] Because we conclude the trial court's reliance on the uncontroverted statement by Donzis was sufficient to support summary judgment, we do not address Biothera's argument that the trial court erred in relying on the October 1998 judgment because that judgment was void or because this court in *Donzis v. McLaughlin* rejected ImmuDyne's "expansive" construction of the October 1998 judgment and the underlying Rule 11 Agreement.

sentence taken from the "Background of Invention" section of the patents, which stated: "Improved methods for isolating a purified water insoluable beta (1,3) glucan extract are disclosed in this inventor's earlier patent, [the '491 patent], which is incorporated herein by reference in its entirety." This sentence supports only a conclusion that the "methods for isolating a purified water insoluable beta (1,3) glucan extract" were *disclosed* in the '491 patent. ImmuDyne proffered no summary judgment evidence to support its contention that either the '719 patent or the '184 patent were improvements to the '491 patent. Nor did ImmuDyne proffer any summary judgment evidence to support its contention that either the '719 patent or the '184 patent were related technology. Finally, ImmuDyne cannot rely on a single sentence in a patent specification to control the intent of the inventor applying for a patent. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (Patent Act section 112 "requires us to look to the language of the claims [made in the patent] to determine what 'the applicant regards as his invention'."), *cert. denied,* 126 S.Ct. 1332 (2006); *see also Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983) (holding that no single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument). Therefore, we conclude summary judgment in favor of ImmuDyne on these two patents was improper.

**B.      Jury Question on the Europatent and the Canadian Patent**

At trial, the question of whether ImmuDyne acquired a license in the remaining two patents was considered by the jury, which answered affirmatively to the following question: "Does ImmuDyne have a sole and exclusive license to" the Europatent and the Canadian patent. On appeal, Biothera does not challenge the legal or factual sufficiency of the evidence in support of this

finding. Instead, Biothera contends this jury question should not have been submitted because it presented a question of law for the court and not a question of fact for the jury. According to Biothera, the answer to this question of law lies on the construction of the unambiguous October 1998 judgment and the unambiguous Rule 11 Agreement. On appeal, Biothera contends (1) the October 1998 judgment is void; (2) in a previous appeal, this court rejected ImmuDyne's "expansive" construction of the October 1998 judgment and the underlying Rule 11 Agreement; (3) the disputed patents were not "improvements" to the '491 patent; and (4) any licenses granted to ImmuDyne are non-exclusive.

### 1. Void Judgment

Biothera first asserts the October 1998 judgment is void because it was signed while the appeal in the Derivative Lawsuit was still pending. Biothera relies on the following time line: (1) on October 26, 1996 the Derivative Lawsuit settled with the parties entering into a Rule 11 Agreement; (2) on February 28, 1997 the trial court rendered summary judgment to enforce the Rule 11 Agreement; (3) on July 15, 1998 this court issued its opinion and judgment reversing the February 28, 1997 judgment; (4) on October 19, 1998 the trial court signed a new judgment; and (5) on October 22, 1998 this court's mandate issued. According to Biothera, because our mandate had not yet issued when the trial court signed the October 19, 1998 judgment, the trial court lacked jurisdiction to change or modify its February 28, 1997 judgment and, therefore, the October 1998 judgment is void.

"Since [Texas Rule of Appellate Procedure] 19's adoption, the fact that the rules allow the appellate court to issue and to recall its mandate after the appellate court's plenary power expires

indicates that it is not the mandate's issuance that generally reinvests the trial court with jurisdiction, but, instead, the termination of plenary power in the appellate court under rule 19.1." *Saudi v. Brieven*, 176 S.W.3d 108, 114 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (considering and rejecting same argument). Here, because no motions for rehearing or motions for extension of time to file for rehearing were filed in this court, and because no petition for review was filed with the Texas Supreme Court, this court's plenary jurisdiction expired, and the trial court generally regained its jurisdiction, no later than September 14, 1998, sixty days after our judgment issued. *See* Tex. R. App. P. 19.1(a). Therefore, we conclude the trial court had jurisdiction to sign the October 19, 1998 judgment and, therefore, it is not void.

### 2. Construction of the Term "Related Technology"

Biothera next asserts this court, in *Donzis v. McLaughlin*, considered and rejected any argument that the term "related technology" as used in the October 1998 judgment and Rule 11 Agreement "refers to and includes" the seven disputed patents made the basis of the lawsuit here. Biothera also asserts ImmuDyne's reliance on the October 1998 judgment and the Rule 11 Agreement fails because ImmuDyne's president, Mark McLaughlin, testified that the Rule 11 Agreement merely reaffirmed the terms of the licensing agreement for the '491 and '479 patents.

In *Donzis v. McLaughlin*, "[t]he parties' dispute . . . centered on the use of the phrase 'related technology' in section B of the Rule 11 Agreement. Donzis and Carmel contend[ed] that the phrase is limited to the technology referenced in the existing license agreements, while McLaughlin and McCarvill read the phrase more expansively." 981 S.W.2d at 62. Unfortunately, the opinion does

state the manner in which McLaughlin and McCarvill read the phrase "more expansively."

Nevertheless, our reading of the opinion leads us to disagree with Biothera's argument on appeal.

To whatever extent the parties may have read the phrase "related technology" "more

expansively," the *Donzis v. McLaughlin* court held the agreement was not ambiguous and stated:

> The Rule 11 Agreement refers to the existing license agreements with regard to the patents and related technology. Subparagraphs 3 and 4 of section B refer to the patents and related technology currently licensed to ImmuDyne and Carmel, respectively, and relate back to the license agreements. By referring to the related technology currently licensed to ImmuDyne and Carmel, the Rule 11 Agreement unambiguously restricts the reaffirmations and representations to the patents and related technology that are contemplated by the license agreements.

*Id.*

The opinion then addressed whether the language in the summary judgment conflicted with or was

more expansive than the language in the Rule 11 Agreement. This court concluded the term

"Licensed Technology" as defined in the summary judgment was more expansive than the term

"Licensed Technology" as defined in the Rule 11 Agreement. *Id.* at 63-64.

Based upon our reading of the entire opinion in *Donzis v. McLaughlin*, we cannot agree with

Biothera's argument that the *Donzis v. McLaughlin* court considered, much less rejected, the

arguments made by ImmuDyne in the underlying declaratory judgment action.

**3. Are the Disputed Patents "Related to" or "Improvements" to the '491 Patent**

Finally, Biothera asserts the trial court erred in awarding the disputed patents to ImmuDyne

because they are not improvements or related technology to the '491 patent. As noted above, neither

the October 1998 judgment nor the Rule 11 Agreement mention the disputed patents. Instead, the

October 1998 judgment and Rule 11 Agreement "reaffirm" that ImmuDyne is the sole and exclusive

licensee worldwide for all patents currently licensed by said entities to ImmuDyne, and shall be the sole and exclusive licensee for such patents *and related technology and all improvements on such patents and related technology*. Accordingly, the jury's finding that ImmuDyne had "a sole and exclusive license to" the Europatent and the Canadian patent is based on an implied finding that these patents were improvements to or related technology to the '491 patent. At trial, Mark McLaughlin, ImmuDyne's president, testified that these two patents were related to the '491 patent. McLaughlin testified the Europatent and the Canadian patent were "identical" to the '491 patent and were "improvements on and related to the '491 technology." Based on this record, we conclude the evidence is sufficient to support the implied finding.

### BIOTHERA'S BONA FIDE PURCHASER DEFENSE TO IMMUDYNE'S ACQUISITION OF THE LICENSES TO THE DISPUTED PATENTS

At trial, the parties disputed whether Biothera's 1999 acquisition of the licenses as a bona fide purchaser cut off ImmuDyne's prior October 1998 acquisition of the same licenses. In jury finding number 4, the jury found that Biothera licensed the patents in good faith, for valuable consideration, and without prior notice of ImmuDyne's interest. According to Biothera, jury finding number 4 entitled it to be the exclusive licensee to the patents covered by its exclusive license agreement with Donzis and extinguished any prior rights in the patents, including ImmuDyne's purported licensing rights. However, the trial court disregarded jury finding number 4, and, on appeal, Biothera argues the trial court's disregard of the jury's finding amounts to reversible error.

A trial court may disregard a jury finding if there is no evidence upon which the jury could have made its findings or the finding is immaterial. *See* TEX. R. CIV. P. 301; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A question is immaterial when it should not have

been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Id.* For the following reason, we conclude jury finding number 4 was immaterial.

On appeal, Biothera relies on *Heidelberg Harris, Inc. v. Loebach*, 145 F.3d 1454 (Fed. Cir. 1998) for its argument that the bona fide purchaser defense applies to a subsequent purchaser of an exclusive patent license. However, almost four years later, the Fifth Circuit granted a petition for rehearing en banc "for the limited purpose of deciding whether the court's decision in [*Heidelberg Harris*] is binding authority on the question of whether the bona fide purchaser doctrine applies to patent licenses." *See Rhone-Poulenc Agro, S.A., v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1334 (Fed. Cir. 2002), *cert. denied sub. nom., Monsanto Co., v. Bayer CropScience, S.A.*, 123 S.Ct. 2668 (2003). The *Rhone-Poulenc* en banc court "decided that, because of unique circumstances in that [*Heidelberg Harris*] case, and the parties' not having contested the issue, *Heidelberg Harris* is not binding authority on the bona fide purchaser issue; and the [*Rhone-Poulenc*] panel is not constrained by the court's decision in *Heidelberg Harris*." *Id.*

The *Rhone-Poulenc* court stated that "[g]enerally, a bona fide purchaser is one who purchases legal title to property in good faith for valuable consideration, without notice of any other claim of interest in the property." *Id.* at 1329. The court noted that "[a]t common law . . . it was quite clear that one who did not acquire title to the property could not assert the protection of the bona fide purchaser rule." *Id.* Here, it is undisputed that Biothera did not hold legal title to any of the disputed patents in 1999; however, Biothera relies on *Rhone-Poulenc* for the proposition that "an exclusive patent license may be tantamount to an assignment of title to a patent . . . when 'the licensee holds 'all substantial rights' under the patent.'" *Id.* at 1334 (citations omitted). Biothera, therefore, argues

that because it is undisputed that it acquired an exclusive license to the patents and holds all substantial rights under the patents, it is entitled to assert the bona fide purchaser defense. We disagree.

We conclude the statement in the *Rhone-Poulenc* opinion relied upon by Biothera is dicta and not binding authority. We believe the holding in *Rhone-Poulenc* stands for the proposition that the bona fide purchaser defense applies only to those entities that acquire legal title to the patent. *See also In re Cybernetic Serv., Inc.*, 252 F.3d 1039, 1051 (9th Cir. 1001) (the terms "assignment, grant or conveyance" in the recordation statute refer to ownership interest only). Because Biothera had not acquired legal title in 1999 to any of the disputed patents, it was not entitled to assert the defense to ImmuDyne's 1998 acquisition of the licenses to those same patents. Therefore, jury finding number 4 was immaterial and the trial court did not err in disregarding the finding.

## OWNERSHIP OF THE DISPUTED PATENTS

During the summary judgment proceeding, the trial court did not consider whether ImmuDyne acquired ownership of the disputed patents. Nor at trial was the jury asked to determine whether ImmuDyne acquired ownership of the disputed patents. Instead, in its final judgment, the trial court declared that ImmuDyne acquired ownership as follows: "[T]he [turnover] Order dated December 27, 2001 . . . assigned ownership of United States Patent Nos. ['491, '009, '773, '015, '719, '184, and the Europatent and Canadian Patent] from [Donzis] to [ImmuDyne] on December 27, 2001."

On appeal, Biothera contends the turnover order, and the resulting trustee assignments of the same patents, could not have divested Donzis of patents he no longer possessed on December 27,

2001. According to Biothera, Donzis had already assigned his interests in the patents to PSA in June 2000; therefore, he owned nothing subject to turnover on December 27, 2001. Biothera also asserts neither it nor PSA were parties to the enforcement action; therefore, the turnover order does not apply to it or PSA and could not have divested them of their respective rights in the patents.

Finally, Biothera asserts the jury's finding that Donzis was responsible for PSA's conduct is not supported by legally sufficient evidence; therefore, the finding cannot be used to retroactively apply the turnover order or the trustee assignment to PSA; and jury question number 2, upon which the finding was based, improperly phrased the legal standard for piercing the corporate veil so as to hold PSA liable for Donzis's conduct. Alternatively, Biothera asserts that even if Immudyne acquired an ownership interest in the disputed patents in 2001, under the bona fide purchaser defense, Biothera acquired ownership of the patents in 1999 in good faith, for valuable consideration, and without prior notice of ImmuDyne's interest.

### 1.    Jury Question Number 2

At trial, ImmuDyne argued that, even if Donzis assigned the patents to PSA, PSA and Donzis were one and the same, such that Donzis's interests were PSA's interests; therefore, PSA's interests in the patents were effectively assigned to ImmuDyne on December 27, 2001. The jury answered affirmatively to question number 2, which asked: "Is [Donzis] responsible for the conduct of [PSA]?"

On appeal, Biothera asserts jury question number 2 was improperly phrased as a traditional piercing-the-corporate-veil issue. Biothera contends that, instead of asking whether Donzis was responsible for PSA's conduct, the trial court should have asked whether PSA was responsible for

Donzis's conduct. According to Biothera, the improperly phrased question unfairly focused the jury's attention on Donzis's conduct, instead of on the conduct of the potentially liable party, PSA. Biothera characterizes the theory under which ImmuDyne sought to hold PSA liable for Donzis's actions as a "reverse piercing of the corporate veil."

Although the Texas Supreme Court has not recognized or addressed the existence of reverse veil piercing as a theory of recovery, the Fifth Circuit has held that Texas would recognize such a theory. *See Zahra Spiritual Trust v. U.S.*, 910 F.2d 240, 244 (5th Cir. 1990). "The ultimate goal in a reverse piercing case is unique; rather than merely disregarding the corporate fiction and holding the shareholders accountable, the court treats the individual and the corporation as 'one and the same.'" *Zahra Spiritual Trust*, 910 F.2d at 243.[5] The remedy is available to hold the corporation liable for debts of the controlling shareholders where the shareholders have formed or used the corporation to secrete assets and thereby avoid preexisting personal liability. *Id.* at 244. "Upon a sufficient showing 'that the corporation is the alter ego of the debtor, the corporation is treated as the debtor and its property may be attached . . . .'" *Id.* (internal citation omitted).

We will assume, without deciding, that the jury should have been asked whether PSA was responsible for Donzis's conduct. However, we do not agree with Biothera that the error, if any, requires reversal because the question, in its entirety, was proper. *De Leon v. Furr's Supermarkets, Inc.,* 31 S.W.3d 297, 300 (Tex. App.—El Paso 2000, no pet.) (to determine whether instruction probably caused an improper judgment, we examine the entire record and the jury charge in its

---

[5] A federal bankruptcy court has stated that "the notion of reverse corporate veil piercing, frankly, has rather thin roots in Texas jurisprudence . . ., and . . . is a rather unusual concept that surely must be cautiously applied (to avoid trampling on due process rights of those not before the court) . . . ." *In re Moore*, 379 B.R. 284, 289 (Bankr. N.D. Tex. 2000).

entirety). Here, question number 2 required the jury to determine whether "[PSA] was organized and operated as a mere tool or business conduit of [Donzis]"; whether "there was such unity between [PSA] and [Donzis] that the separateness of [PSA] had ceased and holding only [PSA] responsible would result in injustice"; and whether "[Donzis] caused [PSA] to be used for the purpose of perpetrating and did perpetrate an actual fraud on [ImmuDyne] primarily for the personal benefit of [Donzis]." The jury was also required to determine whether Donzis "used [PSA] as a means of evading an existing legal obligation for the purpose of perpetrating an actual fraud on [ImmuDyne] for the direct personal benefit of" Donzis.

We conclude these instructions allowed the jury to determine whether Donzis formed or used PSA "to secrete assets and thereby avoid preexisting personal liability." *See Zahra Spiritual Trust*, 910 F.2d at 244. Therefore, we conclude jury question number 2 as phrased was not "reasonably calculated to and probably did [not] cause the rendition of an improper judgment." *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006) (incorrect jury instruction requires reversal only if it was reasonably calculated to and probably did cause the rendition of an improper judgment); TEX. R. APP. P. 61.1(a).

**2.     Should ImmuDyne have pierced PSA's corporate veil first?**

Biothera next asserts ImmuDyne's attempt to pierce PSA's corporate veil was untimely because it was required to obtain a determination of alter ego before commencing the 2001 turnover proceeding against Donzis.

The Texas Turnover Statute is a procedural mechanism by which a "judgment creditor is entitled to aid from a court of appropriate jurisdiction . . . to reach property to obtain satisfaction on

the judgment if the judgment debtor owns property, including present or future rights to property, that . . . cannot readily be attached or levied on by ordinary legal process . . . ." TEX. CIV. PRAC. & REM. CODE ANN. § 31.002(a)(1) (Vernon 2008). Biothera relies on *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 323 (5th Cir. 2006) for its argument that a turnover proceeding is not an appropriate vehicle through which to make an alter ego determination and a separate trial on the merits of that issue is required before the alter ego can be subject to a turnover proceeding. To the extent the holding in *Bollore* applies here, we conclude ImmuDyne properly sought relief in two separate proceedings. ImmuDyne used the 2001 turnover proceeding to satisfy its $600,000 judgment against Donzis, and, in the underlying declaratory judgment action, ImmuDyne sought a finding by the jury that Donzis used PSA to avoid his personal obligation and, thereby, reach the assets of PSA to satisfy that personal obligation.

### 3.    Legal sufficiency of evidence

Finally, Biothera asserts that, in order to hold PSA liable for Donzis's debt, ImmuDyne was required to establish that Donzis had at least a de facto ownership interest in PSA as of December 27, 2001, the date of the turnover order. Biothera asserts the evidence is legally insufficient to establish ownership as of that date. We disagree with Biothera's argument. Although Biothera objected to the question posed to the jury, on appeal it does not complain about the entirety of the instruction, which allowed a finding adverse to Donzis based on a determination that "[PSA] was organized and operated as a mere tool or business conduit of [Donzis]." Therefore, we review the sufficiency of the evidence against the charge actually given to the jury.

The evidence establishes that PSA is a Belize corporation and Donzis acted as its "U.S. agent" for the purpose of receiving all checks made payable to PSA and that Donzis directed Biothera to send all checks made payable to PSA to his address in Hunt, Texas. Events subsequent to the December 2001 turnover order also support the jury's finding. For example, Donzis gave instructions to Deloitte & Touche Corporate Services Ltd. to "draw up a Power of Attorney from [PSA], authorizing [him] to buy, sell, trade, reassign, or barter any trademarks, domain names, or patents owned by [PSA]." Deloitte Touche sought instructions from Donzis regarding the removal of PSA shareholders and conducting "a meeting removing them and appointing new Directors/Officers."

Making all inferences in favor of the jury's finding, as we must, we conclude the evidence of Donzis's relationship with PSA prior to the December 2001 turnover order coupled with the events subsequent to the turnover order constitute legally sufficient evidence to support the jury's implied finding that "[PSA] was organized and operated as a mere tool or business conduit of [Donzis]." Also, at the close of evidence, the trial court granted ImmuDyne's directed verdict against PSA on the issue of alter ego. Biothera does not challenge the directed verdict on appeal. The legally sufficient evidence in support of the jury's finding, combined with the directed verdict against PSA on the issue of alter ego, supports the trial court's declaration that the December 27, 2001 turnover order assigned ownership of the disputed patents from Donzis to ImmuDyne on December 27, 2001.

### 4.    Bona fide purchaser defense

On appeal, Biothera does not challenge the sufficiency of the evidence in support of the jury's finding that it did not acquire ownership of the disputed patents in good faith, for valuable consideration, and without prior notice of ImmuDyne's interest. Instead, Biothera asserts the jury question was improperly phrased. In question number three, the jury was asked: "Did Biothera acquire the Patents-in-Suit in good faith, for valuable consideration, and without prior notice of ImmuDyne's interest?" The question instructed the jury that "notice" "may be based on any fact within the knowledge, or means of knowledge, of [Biothera], and which fact should have logically lead [Biothera], upon inquiry, to a knowledge of the existence and purport of ImmuDyne's interest." On appeal, Biothera argues the question failed to distinguish between ImmuDyne's *ownership* interest and its *licensing* interest. According to Biothera, this distinction is important because the *ownership* of a patent may be acquired even if the *licensing* rights in that patent were previously conveyed to another party. Biothera contends the question as phrased allowed the jury to reject its bona fide *ownership* claim based on Biothera's alleged notice of ImmuDyne's claim to *licensing* rights. Therefore, Biothera concludes, jury question number three should have more specifically inquired into whether Biothera had any notice of ImmuDyne's *ownership* interest.

Although the question made no distinction between ImmuDyne's ownership of the patents and its license of the patents, we conclude the question adequately defined notice as "any fact within the knowledge, or means of knowledge, of [Biothera], and which fact should have logically lead [Biothera], upon inquiry, to a knowledge of the existence and purport of ImmuDyne's interest." Therefore, we conclude jury question number 3 as phrased was not "reasonably calculated to and

probably did [not] cause the rendition of an improper judgment." *Bed, Bath & Beyond*, 211 S.W.3d at 757; TEX. R. APP. P. 61.1(a).

**ATTORNEY'S FEES**

Finally, Biothera asserts the trial court abused its discretion in awarding attorney's fees to ImmuDyne because (1) ImmuDyne did not segregate the fees incurred as against each of the three defendants, (2) there is insufficient evidence of reasonableness or necessity because the awarded fees included fees incurred in a separate federal patent infringement lawsuit, and (3) the award was unjust in view of the jury's finding that Biothera licensed the patents in good faith.

## A. Remand to the Trial Court

As explained above, we reverse the summary judgment in favor of ImmuDyne on the issue of the licenses to the '719 and the '184 patents, and remand for further consideration. However, the reversal of the trial court's judgment in a declaratory judgment action does not necessarily mean the award of attorney's fees to the party who prevailed in the trial court was an abuse of discretion.

In a declaratory judgment action, the prevailing party is not entitled to attorney's fees as a matter of law. *Marion v. Davis*, 106 S.W.3d 860, 868 (Tex. App.—Dallas 2003, pet. denied). In the exercise of its discretion, the trial court may decline to award attorney's fees to either party. *See Univ. of Tex. Health Sci. Ctr. v. Mata & Bordini, Inc.*, 2 S.W.3d 312, 319 (Tex. App.—San Antonio 1999, pet. denied); *United Interests, Inc. v. Brewington, Inc.*, 729 S.W.2d 897, 906 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.). Or, the trial court may award attorney's fees to the nonprevailing party. *See Scottsdale Ins. Co. v. Travis*, 68 S.W.3d 72, 77 (Tex. App.—Dallas

2001, pet. denied); *Borum*, 53 S.W.3d at 894. Thus, ImmuDyne did not need to prevail on its claim for declaratory relief to be entitled to attorney's fees.

Nevertheless, after a declaratory judgment is reversed on appeal, an award of attorney's fees may no longer be equitable and just. *See Scottsdale Ins.*, 68 S.W.3d at 77; *Borum*, 53 S.W.3d at 894-95. Therefore, when we reverse a declaratory judgment and the trial court awarded attorney's fees to the party who prevailed at trial, we may remand the attorney's fee award for reconsideration in light of our disposition on appeal. *Id.*

Because an award of attorney's fees under the Declaratory Judgment Act continues to fall within the trial court's discretion, whether the trial court wishes to reconsider its decision on attorney's fees is a matter we defer to the trial court. To allow the trial court to make that determination, we reverse the portion of the judgment awarding attorney's fees to ImmuDyne and remand the issue of attorney's fees to the trial court for its reconsideration in light of this opinion. *State Farm Lloyds v. Borum*, 53 S.W.3d 877, 894-95 (Tex. App.—Dallas 2001, pet. denied) (reversing and remanding "because the record does not reflect the trial court's reasons for its award of fees to [prevailing party], there is no evidence to indicate whether the trial court's award of fees would also be equitable and just in light of our opinion in this case."). However, there are two issues that may be revisited upon retrial; therefore, we will address those issues in the hope of streamlining the remaining litigation. *Lone Star Gas Co. v. Railroad Comm'n,* 767 S.W.2d 709, 711 (Tex. 1989) ("Although the rules [of appellate procedure] do not require or contemplate advisory opinions on issues not essential to the final disposition of a case, the rules do mandate full consideration of all issues raised to move the case as far as possible toward final disposition.").

**B.      Segregation of Fees**

Generally, the party seeking to recover attorney's fees carries the burden of proof.  *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991).  A court may award those fees that are "reasonable and necessary" for the prosecution of the suit.  *Id.*  "In order to show the reasonableness and necessity of attorney's fees, the plaintiff is required to show that the fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees."  *Id.*  "A recognized exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'"  *Id.* at 11.  "Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims."  *Id.*

The Supreme Court, in *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299 (Tex. 2006), modified to some extent its holding in *Stewart Title*.  In *Tony Gullo*, the Supreme Court was faced with the issue of whether fees incurred on a fraud claim should have been segregated from fees incurred on breach of contract and DTPA claims.  The Court held that attorney's fees on the fraud claim were not authorized by either statute or contract and, therefore, unrecoverable; while the fees incurred on the contract claim and DTPA claim were recoverable.  *See id.* at 310-11.  Having decided that the fees incurred on the fraud claim were unrecoverable, the Court then determined those fees should have been segregated out and that it was possible for the plaintiff's attorneys to identify fees incurred on each asserted claim.  *Id.* at 313. In so holding, the Court modified the

holding in *Stewart Title* to the extent that "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees. Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." *Id.* at 313-14.

Here, ImmuDyne brought its declaratory judgment suit for a single purpose: to obtain a declaration from the court that it was the sole and exclusive licensee and owner of the disputed patents. There is no dispute here that the Declaratory Judgment Act authorizes the recovery of attorney's fees. TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008). Because the fees sought by ImmuDyne were recoverable pursuant to statute and ImmuDyne's request for declaratory relief against the three defendants was "dependent upon the same set of facts or circumstances and thus . . . 'intertwined to the point of being inseparable,'" we conclude ImmuDyne was not required to segregate its fees as to each separate defendant.

**C.     Fees Incurred in Minnesota Federal District Court Lawsuit**

Biothera next asserts the trial court erred by including in the award attorney's fees ImmuDyne allegedly incurred in the patent infringement suit pending in federal court. At trial, ImmuDyne's attorney estimated total fees incurred would be approximately $400,000, of which he attributed $75,000 to the federal case. Counsel testified that ImmuDyne had hired attorneys in Minnesota to defend in the federal lawsuit, but that he had been also "involved in that." Counsel characterized, without further explanation, the federal suit as "the mirror image of this [Texas] case." The jury

awarded to ImmuDyne, "for preparation and trial," fees in the amount of $450,000, as well as additional fees on appeal.

In reviewing a fee award under the Declaratory Judgment Act, we must determine whether the trial court abused its discretion by awarding fees when there was insufficient evidence that the fees were reasonable and necessary, or when the award was inequitable or unjust. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998). There are four limitations imposed on the court's discretion: the fees awarded must be reasonable and necessary, which are matters of fact, and they must be equitable and just, which are matters of law. *Id.* "In order to show the reasonableness and necessity of attorney's fees, the plaintiff is required to show that the fees were incurred while suing the defendant sought to be charged with the fees on a claim which allows recovery of such fees." *Stewart Title*, 822 S.W.2d at 10.

Here, the federal lawsuit is based on allegations of patent infringement, allegations not made in the underlying declaratory judgment suit. ImmuDyne has not shown "that the fees were incurred while suing the defendant sought to be charged with the fees." *Id.* We can think of no reason why attorney's fees incurred in litigating a patent infringement dispute pending in a Minnesota federal district court should be awarded against a party in a separate declaratory judgment suit pending in Texas state court. Therefore, to the extent any of ImmuDyne's counsel's fees were not incurred in the underlying declaratory judgment action, the trial court erred in assessing those fees against Biothera.

**CONCLUSION**

We reverse the summary judgment in favor of ImmuDyne on the issue of the licenses to the '719 patent and the '184 patent and remand for further consideration. We reverse that portion of the final judgment awarding attorney's fees to ImmuDyne for trial and on appeal. We affirm in all other respects.


Sandee Bryan Marion, Justice