In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-12-00114-CV

**VALERI S. VARNADO, ADMINISTRATRIX
OF THE ESTATE OF VERNON VARNADO, Appellant**

**V.**

**R & D MARBLE, INC., RANDALL CHELETTE
AND JAMES TRAHAN, Appellees**

**On Appeal from the County Court at Law No. 2
Montgomery County, Texas
Trial Cause No. 10-08-08378 CV**

**MEMORANDUM OPINION**

Vernon Varnado owned a sole proprietorship, doing business as Southern Manufacturing. At the time of Vernon's death in October 2006, Vernon's son-in-law, Randall Chelette was acting as the general manager of the business. Vernon died without a will.

On May 24, 2007, Valeri Varnado (Vernon's daughter and Chelette's wife at the time), filed an application for letters of administration, and she was appointed

as the dependent administrator of her father's estate. She later became the independent administrator. On July 23, 2007, the probate court granted Valeri the authority to operate Southern Manufacturing, including the power to incur debt on behalf of the business and to enter into contracts.

The next month, Chelette submitted an application for credit to R&D Marble, Inc., a supplier of materials. The company name on the application was Southern Manufacturing. R&D had not previously conducted business with Southern Manufacturing. The application was approved in August, and R&D immediately began selling product to Southern Manufacturing.

On September 6, Valeri filed an application with the probate court to form a limited liability company, Southern Manufacturing Co., L.L.C. The probate court approved the application. The certificate of formation was filed with the Secretary of State on September 21, 2007.

According to Chelette, now Valeri's ex-husband, Valeri fired him in October 2008; Valerie claims he quit. According to her, James Trahan took over the duties of general manager. In 2009, R&D required an updated credit application as part of its routine business practice. Trahan signed the new application. Valeri fired Trahan in February 2010.

Southern Manufacturing paid over $300,000 for materials purchased from R&D. Invoices for $44,309.13 of material from December 2009 to June 2010 were never paid. R&D sued Chelette, Trahan, and Valeri S. Varnado, individually and doing business as Southern Manufacturing, to recover the unpaid amount. An amended petition added appellant Valeri S. Varnado, as independent administrator of the estate of Vernon Varnado, as a defendant.

Trahan filed a counterclaim for fraud against R&D and a cross-claim for indemnification against Southern Manufacturing. Chelette filed a cross-claim for indemnification against Southern Manufacturing.

The trial court granted a directed verdict in favor of Valeri S. Varnado, individually. The jury found that R&D and Valerie Varnado, as administrator of the estate of Vernon Varnado, doing business as Southern Manufacturing, had an agreement regarding the purchase of goods, and that appellant failed to comply with the agreement. The jury also found that Chelette and Trahan had failed to comply with their personal guarantees, but that their failure to comply was excused.

The court signed a judgment on the jury's verdict. The judgment provided that appellant Valeri S. Varnado, as independent administrator of the estate of Vernon Varnado, pay R&D Marble, Inc. damages of $44,309.13, plus pre-

judgment interest, post-judgment interest, and attorney fees. The judgment incorporated the jury's verdict in favor of Chelette and Trahan on the cross-actions against Valerie S. Varnado, as administrator, and ordered her as administrator to pay Chelette's and Trahan's attorney fees. The trial court ordered that R&D Marble, Inc. take nothing against Valeri S. Varnado, individually, and that Chelette and Trahan take nothing on their counterclaims against R&D Marble, Inc.

THE EVIDENCE

Richard Holt testified that he was an independent contractor managing sales for R&D. He had known Randy Chelette since 1993 and knew he was married to Valeri. Before his affiliation with R&D, Holt had business dealings with Chelette at Southern Manufacturing. Holt knew that prior to Vernon Varnado's death, Vernon was the owner of Southern Manufacturing and Chelette was the general manager of the company. A vendor told Holt that Chelette had indicated he would like to buy product from R&D. Holt called Chelette at Southern Manufacturing. Because Holt knew Vernon had passed away, Holt asked Chelette if he was still in charge of the company. Chelette said he was still the company's general manager. Holt faxed a blank credit application to Southern Manufacturing. Chelette filled out the application.

Todd Downey, president and an owner of R&D, testified that he was aware Vernon had passed away, and he assumed that Valeri had inherited the company. Downey explained that when he processed the first credit application, he looked at the credit of both Southern Manufacturing and Chelette. When he reviewed Southern Manufacturing's credit, Downey believed it showed Vernon Varnado as the company's owner. He knew Valeri and Chelette were married and believed that Chelette, who had signed the credit application and was listed as the manager of Southern Manufacturing on Chelette's credit report, had the authority to enter into contracts on behalf of the company.

When Valeri and Chelette divorced, Downey believed that Valeri was running the company. Downey believed at all times that he was doing business with Valeri Varnado as the administrator of Vernon's estate, and that the materials were being shipped to Southern Manufacturing, a sole proprietorship. Valeri spoke with Downey on at least three occasions. Neither Valeri nor anyone else with Southern Manufacturing ever advised Downey that a limited liability company had been formed. Downey explained that he believed Chelette's and Trahan's signatures on the credit applications were also their personal guarantees of the account. Downey was not aware of the limited liability company until after R&D filed suit.

5

The applications for credit signed by Chelette and Trahan are both in the name of Southern Manufacturing and include the company information at the top. The bottom of the applications includes a section entitled "personal guarantee" which includes a signature line for the guarantor. Below the signature line, the form states, "Form must be complete to be considered for credit. Please make sure application has been signed both as a company and/or representative and individually."

Chelette testified he and Valeri were married in 1990. He began working for Southern Manufacturing in 1991 and took more of a managerial position around 1998. Vernon ran the business until he passed away, and then Chelette was general manager of the business and Valeri ran the company. He explained that the credit application he signed for R&D in August 2007 had different wording than the other credit applications he had completed. He stated that when he signed the credit application he was still married to Valeri, the owner of the company. Chelette testified that at some point the company became a limited liability company. But he testified that at the time he signed the application, he was guaranteeing the payment for products of a "d/b/a" and he expected the company to pay the debt. The earliest unpaid R&D invoice is dated December 15, 2009, at

6

least thirteen months after Chelette was fired. The invoice did not include any products ordered by Chelette on behalf of the company.

Trahan testified that after Vernon died, Valeri owned Southern Manufacturing and Chelette was general manager. According to Trahan, after Chelette left, no one served as general manager. Trahan handled most of the sales and purchased materials but had no authority to hire or fire, and no access to Southern Manufacturing bank accounts. Trahan told Holt that Trahan did not have authority to sign the credit application, and Holt indicated R&D just needed a signature and to not worry about filling out the rest of the form. Trahan read the application which said it had to be complete for the applicant to be considered for credit. Trahan signed the document but did not complete the application. Trahan testified he did not fill out the top portion of the application, and the handwriting on the rest of the application was not his.

Valeri testified that the business assets were moved from the estate to the L.L.C., and that the business was operated as a limited liability company while the business was administered by the estate. Valeri admitted she does not remember ever telling anyone with R&D that R&D was no longer doing business with Southern Manufacturing as a d/b/a. Even though the business accounts changed to a different bank at one point, at all times Valeri paid R&D from checks bearing the

7

name of Southern Manufacturing, the name of the sole proprietorship. She conceded she never advised R&D that she had formed an L.L.C. or that she intended for the L.L.C. to be responsible for the debt. According to Valeri, Chelette ceased managing the sole proprietorship and began managing the limited liability company upon the date of the limited liability company's formation. This arrangement continued until Chelette's employment with the company ceased. Valeri maintains that any orders received after September 21, 2007 would have been received by Southern Manufacturing Co., L.L.C.

SUFFICIENCY

As independent administrator, Valeri Varnado filed this appeal. In appellant's first issue, she argues there is no legally or factually sufficient evidence supporting the finding that she, as the independent administrator of her father's estate, incurred the debt reflected on the outstanding invoices on behalf of the estate. She contends that Chelette and Trahan were employees of Southern Manufacturing Co., L.L.C., and were not authorized to enter into agreements with R&D on her behalf. She maintains there is no statutory requirement that she notify creditors of Southern Manufacturing Co., L.L.C.'s existence.

8

To address a legal sufficiency challenge, an appellate court reviews the entire record, and credits favorable evidence if reasonable jurors could, and disregards contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We must assume in this case that the jurors decided questions of credibility or conflicting evidence in favor of the verdict if they reasonably could do so. *Id.* at 819-20. The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. If the evidence "would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so." *Id.* at 822. (footnote omitted). An appellate court cannot substitute its judgment for that of the trier-of-fact if the evidence falls within the "zone of reasonable disagreement." *Lee v. Hasson*, 286 S.W.3d 1, 13 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *City of Keller*, 168 S.W.3d at 822). When a court of appeals reviews a jury finding for factual sufficiency, the court considers and weighs all the evidence, and concludes that the finding is not supported by factually sufficient evidence only if the finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*. at 14. (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)).

Southern Manufacturing Co., L.L.C. did not exist when Southern Manufacturing submitted its initial application for credit to R&D. Based on the application for credit, R&D agreed to sell materials to the sole proprietorship, Southern Manufacturing. The probate court granted Valeri Varnado, as administrator of the estate, the power to operate Southern Manufacturing, including the authority to incur debt on behalf of the business. The evidence indicates R&D was unaware that Southern Manufacturing Co., L.L.C. had subsequently been formed. Valeri Varnado paid for the materials with checks from Southern Manufacturing. R&D believed at all times that it was doing business with Southern Manufacturing. The record does not reflect the filing of a new assumed name certificate or a "statement of abandonment" for the sole proprietorship. *See* Tex. Bus. & Com. Code Ann. § 71.152 (West Supp. 2012) (A new assumed name certificate is to be filed within sixty days of an event "that causes the information in a certificate to become materially misleading[,]" including a change in "name, identity, entity, [or] form of business[.]"); *see also* Tex. Bus. & Com. Code Ann. § 71.153(b) (West 2009).

The jury could reasonably reject some or all of the testimony of any witness, including those witnesses testifying in favor of appellant's position. The jury could reasonably conclude that the business was carried on under the same name, and

10

that R&D was not notified and had no knowledge of the limited liability company. The jury could reasonably conclude that R&D believed it was dealing with the sole proprietorship, Southern Manufacturing, and advanced credit. Under the circumstances, the formation of a new entity did not release the estate of its liability under the contract. The evidence is legally and factually sufficient to support the jury's verdict that appellant in her representative capacity had an agreement with R&D to extend credit; appellant purchased the goods represented in the unpaid invoices; and appellant in her representative capacity for the estate was responsible for payment of the debt. Issue one is overruled.

ATTORNEY FEES

Appellant also maintains that the evidence supporting the jury's finding of $17,500 in attorney fees is legally and factually insufficient. Appellant argues R&D's counsel did not segregate the fees between recoverable fees for suit on sworn account/breach of contract and unrecoverable fees for quantum meruit and unjust enrichment. Appellant argues there was no segregation of attorney fees between claims against appellant on the sworn account/breach of contract causes of action and on the claims R&D had against Chelette and Trahan regarding personal guarantees. Appellant argues the trial court awarded R&D attorney fees for R&D's counsel's pursuit of "claims against Chelette and Trahan even though [R&D] did

11

not recover from Chelette and Trahan." R&D counters that it did not have to segregate attorney fees because the claims are "inextricably intertwined."

Generally, a party seeking to recover attorney fees is "required to segregate fees between claims for which they are recoverable and claims for which they are not." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006). But to the extent attorney fees "would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service." *Id.* at 313. Here, the attorney fees related to R&D's claims against appellant and against Chelette and Trahan on their personal guarantees were for the same debt. The claims were so intertwined that their prosecution entailed essentially the same work and proof. *See id.* at 313-14 ("[A] claimant must segregate recoverable from unrecoverable fees [and] it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated."). Under the circumstances here, the fact that other defendants have avoided liability for the debt does not relieve appellant of liability for the fees incurred in recovering a judgment on the debt. Issue one is overruled.

JUDGMENT INTEREST

In her second issue, appellant asserts that even if she is liable to R&D as independent administrator of her father's estate, there is no legal or factual basis

for the court's award of interest at eighteen percent. Appellant argues that because she, as independent administrator of her father's estate, did not have a written agreement with R&D, the trial court should have applied the sections of the Finance Code which provide the interest rates where the rates are not specified in an agreement.

We have concluded that the evidence is sufficient to support the jury's verdict, and that appellant is liable under the contract. Post-judgment interest in a contract case where the contract provides for interest is the lesser of the interest rate specified in the contract or eighteen percent a year. *See* Tex. Fin. Code Ann. § 304.002 (West 2006); *see also Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 532 (Tex. 1998). If the contract does not provide for a rate of interest, then the interest rate is calculated based on the statutory rate provided in the Finance Code. *See* Tex. Fin. Code Ann. § 304.003 (West 2006).

The application for credit provided to R&D was for Southern Manufacturing. The approval of the application allowed Southern Manufacturing to acquire hundreds of thousands of dollars of materials and stated that "[a]ll amounts due [R&D] and not received at [R&D's] offices at the address listed on or before closing of each month and which amounts are past 30 days old shall be subject to a finance charge of 1.5% per month which is an annual percentage rate

of 18%." The trial court properly awarded R&D interest in the amount of the contracted rate. *See* Tex. Fin. Code Ann. § 304.002. Issue two is overruled.

### CHELETTE'S AND TRAHAN'S INDEMNIFICATION CLAIMS

In her third issue, appellant argues there is no legal basis and no sufficient evidence to support the awards of damages and attorney fees to Chelette and Trahan on their claims for indemnification. Chelette and Trahan filed with this Court a letter brief stating that they no longer wish to pursue their claims for attorney fees. We therefore modify the trial court's judgment by deleting in its entirety the award of attorney fees in favor of Chelette and Trahan. We affirm the trial court's judgment as modified.

AFFIRMED AS MODIFIED.

_____
DAVID GAULTNEY
Justice

Submitted on June 18, 2013
Opinion Delivered October 31, 2013

Before Gaultney, Kreger, and Horton, JJ.

14